STATE of Missouri, Plaintiff-Respondent,

v.

John Earl MACON, Defendant-Appellant.

No. 37475.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Feb. 15, 1977.

Robert C. Babione, Public Defender, John M. Putzel, Neal P. Murphy, Asst. Public Defenders, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Donald A. Purdy, Jr., Asst. Attys. Gen., Jefferson City, Brendan Ryan, Circuit Atty., Raymond A. Bruntrager, Jr., Evelyn Baker, Asst. Circuit Attys., St. Louis, for plaintiff-respondent.

SIMEONE, Chief Judge.

This is an appeal by defendant-appellant, John Earl Macon, from a judgment of conviction entered by the circuit court of the City of St. Louis on October 6, 1975, sentencing him to the department of corrections for a period of twelve years for the offense of robbery in the first degree by means of a dangerous and deadly weapon. Sections 560.120, 560.135, RSMo. Appellant was found guilty by the jury for the offense; the jury could not agree on punishment so the court assessed punishment.

Appellant appeals and raises several points urging a reversal of the judgment of conviction and remand for further proceedings. For reasons hereinafter stated, we affirm.

The jury could reasonably find the following. In the early evening of November 25, 1974, Mrs. Jacqueline Sharp was en-

gaged in her employment as a barmaid at the Barcelona Cocktail Lounge located in the City of St. Louis. The lounge was owned by Mr. Edward Mansfield. There were ten or fifteen customers in the lounge including Mr. L. C. Collins and Mr. Laird Mitchell. The lounge contained two bars— one east and one west. At about 8:00 p. m. three men came into the lounge. Two of the men went to the bar on the west side and one came up to the east bar where Mrs. Sharp was standing and requested her to give him change for a dollar so that he could get some cigarettes and play the juke box. The man was in front of the bar. The lights were "clear enough where you could see someone clearly." The man was about seven or eight feet away from her. Mrs. Sharp saw the man's face. Mrs. Sharp gave the man change for a dollar which she obtained from the cash register behind the bar. She asked the other two men if they wanted anything and they replied, "No." After giving the man change, Mrs. Sharp "went to wait on a customer" and the man announced, "it's a holdup." He had a silver gun in his right hand. When she heard these words, she "froze." The man said, " 'I want all the money in the cash register.' " Mrs. Sharp "got all the green" and took "all the silverware—silver and put it in a glass" and "handed it to him." One hundred and forty eight dollars and some change was taken. The other two men were "[m]essing with the customers"—taking their money and jewelry. These two men also had guns. After that, the man who requested the change and announced the holdup ordered Mrs. Sharp and the customers into respective restrooms.

Mrs. Sharp eventually came out of the restroom and called the police. When the police came she gave them a description of the man who robbed her—five feet five, light brown complexion, long sideburns, a mustache and a goatee.

One of the customers, Mr. L. C. Collins, had been in the lounge since mid-afternoon and was present when the three men came in. He was seated at the bar.

One of the men who came in stood behind him. After about "fifteen, maybe twenty minutes, some fellow hollered, 'stick-up,' so when I looked back, I looked back and this fellow had a gun." He did not see the man who took the money from the cash register (Macon) but testified that the man who stood behind him took from him "[f]ifty-two dollars and some change." He testified that he could not identify the appellant, did not see a man hold a gun on Mrs. Sharp, but did state that he lost his money. He corroborated the fact that the customers were forced into the restroom "after the stickup."

Another customer in the cocktail lounge was a student, Mr. Laird Mitchell. While he could not recall the exact time of the year this episode took place, he was in the lounge the night of the robbery. He was seated at the bar and was drinking beer. He noticed the three men come in "[b]ecause they were young like myself and normally no young guys about my age come in there." He saw two men with guns, and "[t]hey pointed them up at us, told us it's a stick-up, don't nobody move, all the money and wallets on the bar." He complied and put his wallet on the bar. At trial, Mr. Mitchell identified the defendant as one of the robbers and the one who robbed him. "I never forget his face, never." Mitchell testified that he "knew his [Macon's] face but not his name . . . [t]hrough a friend of his that is a friend of mine." He was "absolutely positive" that the defendant was the man. Mr. Mitchell did not tell the police that he had seen the defendant before "because I was afraid."

When Mrs. Sharp called the police, Officer Russell Nothdurft responded to the call and spoke to Mrs. Sharp. He received a description from Mrs. Sharp and put it on the police radio.

Later that evening of November 25, 1974, some policemen returned to the lounge and showed Mrs. Sharp some ten to fifteen photographs showing the faces of different men. She could not identify the defendant from any of these pictures. Sometime later, on January 14, 1975, (although at one

point Mrs. Sharp indicated it was about a week or two weeks later but later said it was in January), she examined two photographs. One photo had four men and the other five. The photos were shown to her by Detective Wilbert Farrell. She examined the two photographs for about "fifteen minutes" and identified only the defendant. According to Detective Farrell, Mrs. Sharp picked out the defendant from one of the pictures and he was the only person she identified. Later, Detective Farrell participated in the arrest of the defendant at defendant's home. At one point in her testimony she indicated she picked out two men—"one of the two gentlemen I think was at the door." Sometime later, on January 22, 1975, Mrs. Sharp was requested to view a lineup at the police headquarters. She viewed a lineup consisting of four men, one of whom was the defendant. She identified the defendant as the man who robbed her. The lineup was conducted with the assistance of Detective John Vardeman who had also participated in the arrest. At trial he was shown a photograph of the individuals who were in the lineup and indicated that the appellant was somewhat shorter than the others.

On February 13, 1975, the appellant was indicted by the grand jury. The indictment charged that he, with others, "did rob, steal, take and carry away, one hundred and forty-eight dollars . . . the property of Ed Mansfield in the care and custody of Jacqueline Sharp . . . ." Prior to trial, defendant moved to suppress the identification testimony "on the grounds that the conduct of identification procedures at a pretrial confrontation were so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of constitutional due process of law."

Prior to the opening statements at the trial, a hearing was held on the motion. Mrs. Sharp, Detective Vardeman and Detective Farrell testified. Mrs. Sharp testified that she viewed two sets of photographs—one on the evening of November 25 and one sometime later. On the evening of the robbery she was shown ten–fifteen

photos but did not identify the defendant. But, when asked by the court whether she identified anybody she saw in the tavern that night, she replied, "I picked a couple of other ones out, but that was other fellows, not that gentleman." [apparently referring to defendant] She further indicated she picked out "[t]wo or three" photographs that night. When she was shown the second set of two photographs later in January containing four or five men on each picture, she identified the defendant. She was later called to view the lineup, and when she did so she identified the defendant. She indicated they were not all the same height, did not have the same complexion and "really didn't look alike."

Detective Vardeman testified on the hearing on the motion. He testified that he participated in the conduct of the lineup which was held on January 22, 1975. There were three other persons in the lineup, all "approximately the same height." Mrs. Sharp viewed the lineup, but, before she did so, she was not shown any photographs. Detective Vardeman testified that the defendant was not the "smallest" in the lineup.

Detective Farrell also testified on the hearing on the motion. He stated that he participated in the investigation concerning the Barcelona Lounge and interviewed Mrs. Sharp on January 14, 1975. He showed her the second set of two full-length photos which included the picture of the defendant. While he was not present at the lineup on January 22, 1975, he was aware that a lineup took place. To his knowledge the only person who appeared in the lineup was the only person identified from the photographs.

The last witness on the hearing on the motion was Henry J. Rieke, employed by the public defender. He was present at the lineup when the defendant was identified. He indicated, from a photograph, that the subjects were not of the same height. And that "[s]ubject number two [the defendant]" was the shortest in the lineup.

At the conclusion of the hearing on the motion to suppress the identification testi-

mony, the trial court found that "there is no evidence to indicate that the identification procedures were in any way suggestive or tainted," and the court therefore overruled the motion. The trial then proceeded during which the above facts were brought out in the state's case. Mrs. Sharp, at trial, identified the man who announced the hold-up and to whom Mrs. Sharp gave the money from the cash register as the defendant, John Earl Macon. When asked "Will you ever forget the face?", she replied "Never." She was "positive" that the appellant was the man.

In the defendant's case, Mrs. Essie Macon, defendant's mother, and the defendant testified. The mother testified that the defendant was ill during the week of November 25, but she could not be certain that he was ill or at home on the evening of November 25. Mr. Macon, the defendant, testified and denied that he was at the Barcelona Lounge on the night of November 25, and denied robbing anyone in that lounge. During the direct examination of the defendant, the following occurred:

"[Defense Counsel] Q. Okay John, have you ever been convicted of a crime?

"A. No, sir.

"Q. You've never been in any trouble, is that right?

"A. No, sir."

On cross examination the assistant circuit attorney asked:

"Q. . . . In view of [defense counsel's] question to you, have you ever been arrested—for what have you been arrested?

"A. I was arrested for stealing under fifty.

"Q. Stealing under fifty or stealing over fifty?

"A. I don't know, one of them.

"Q. 1973. You were arrested for the possession of a Missouri controlled substance, a narcotic drug?

"A. No, sir.

* * * * * *

"Q. You don't recall being arrested in St. Louis County by the St. Louis County police on the charge of unlawful possession of a controlled substance on that day?

"A. No, sir."

The case closed; the jury was instructed and the cause argued. The court gave the verdict director, MAI–CR 7.62, an alibi instruction, MAI–CR 3.20 and instruction No. 5 based on MAI–CR 2.10 at the request of the state. Instruction No. 5 told the jury:

"All persons are guilty who knowingly act together with the common purpose of committing an offense, or who knowingly and intentionally aid or encourage another in committing it, and whatever one does in furtherance of the offense is the act of each of them."

The second paragraph of MAI–CR 2.10 was omitted.

The cause was argued and, in the course of the first part of the state's argument, the assistant circuit attorney discussed the testimony of the defendant that he had never been in trouble before and that it was brought out that he had been arrested before.

After the arguments, the jury retired to deliberate. After "approximately one hour and forty-five minutes" the jury returned with two verdicts—one indicating the punishment at seven years and the other "merely says unanimous verdict." The court had the clerk read the verdict which found the defendant guilty and assessed his punishment at seven years. The jury was then polled and it was determined that not all the jurors agreed with the punishment. The court then indicated that it could not accept the verdict and stated that it would send the jury back to deliberate further. The court told the jury that if it could not agree on punishment the court would assess the punishment. The dinner hour was near and other verdict forms would have to be prepared. The sheriff indicated that it would take fifteen to twenty minutes to prepare other verdict forms. The court then asked the foreman whether, if the jury had another fifteen or twenty minutes, it

could reach a verdict. The foreman was unsure. The court again indicated that it would return the jury for further deliberation. After an objection by defense counsel to the court's indication that it would set punishment, and after some discussion, the trial court then inquired of the foreman whether the jury agreed "upon a verdict with regard to the guilt or innocence of the defendant." The foreman replied that it had reached a verdict of guilty. Then the following occurred:

"THE COURT: It is guilty. Now do I understand that this jury cannot agree upon the punishment?

"[FOREMAN]: True.

"THE COURT: All right.

"[FOREMAN]: We would like to rebolish [sic] it to the Court."

The court thereupon requested a verdict form which indicated that the jury finds the defendant guilty but could not agree on punishment and asked the foreman to sign the form. Over the objection of defense counsel, the foreman signed the verdict form finding the defendant guilty "but [that the jury] cannot agree on punishment." The jury was polled and each member concurred in the verdict. The verdict was then received.

Within due time, a motion for new trial was filed, allocution was granted, the motion was overruled and the defendant sentenced to twelve years.

On this appeal appellant contends that the trial court erred (1) in overruling his motion to suppress the identification testimony of Mrs. Sharp because "the conduct surrounding the pre-trial confrontation was so unnecessarily suggestive and conducive to irreparable misidentification as to amount to a denial of constitutional due process of law"; (2)(a) in overruling his objection to the testimony of Mr. Collins "when he stated that he was robbed[—]such testimony being proof of other crimes with which appellant was not charged and in connection with which appellant was not identified," and (b) in overruling his objection to the state's argument referring to the robbery of Mr. Collins; (3) in allowing

the state to cross-examine the defendant concerning his prior arrests; (4) in giving MAI–CR 2.10 without the second paragraph; and (5) in submitting to the foreman of the jury a verdict form because "in doing so the Court took upon itself . . . the duty of assessing punishment and thereby infringed defendant's right to have the jury deliberate and arrive at its verdict in private."

As to the first point, appellant contends that the inconsistencies in Mrs. Sharp's testimony regarding the two occasions when she viewed photographs suggest that a likelihood of misidentification occurred and that the inconsistencies indicate that her in-court identification was impermissibly tainted. He also complains that the "uncertainty of Ms. Sharp's testimony regarding men she did (or did not) identify from the two photographic displays shows a great likelihood that misidentification took place." He further argues that the fact that appellant was the only person included in the lineup from among the men in the photographs shows that her attention was necessarily and impermissibly focused on appellant at the lineup thus tainting her in-court identification.

Despite these contentions we hold that the trial court did not err in overruling the motion to suppress the identification testimony.

■ The principles relating to due process protection against the admission of evidence derived from allegedly suggestive identification procedures are now well settled and have been set forth by the United States Supreme Court and by the courts of this state. See *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); see discussion in *State v. Rutledge*, 524 S.W.2d 449, 455–456 (Mo.App.1975). Whether the identification procedures are so unnecessarily suggestive is to be determined from the totality of the circumstances. And, even though the photograph or lineup identification is tainted or

in some way suggestive, where there is an independent factual basis for the in-court identification, an in-court identification is proper. *State v. Hall*, 541 S.W.2d 327, 328 (Mo.App.1976).

◼ Tested within these principles, there was no error in overruling the appellant's motion to suppress Mrs. Sharp's identification testimony. Under the totality of the circumstances, the photographic and lineup identifications were not impermissibly suggestive or conducive to irreparable misidentification. The appellant's real complaint is that there are some inconsistencies in her testimony as to the photographs—having said she identified only the defendant in the second set of photographs and later indicating she identified two of the individuals in the lounge. This is not sufficient to show impermissible suggestive procedures. The apparent inconsistencies in Mrs. Sharp's testimony regarding the occasions when she viewed photographs do not, under the circumstances, show a likelihood of misidentification.

Furthermore, there was an independent factual basis for Mrs. Sharp's in-court identification. Mrs. Sharp observed the defendant at the time of the robbery; she was only a few feet away from him; he asked her for some change; and she was positive that the defendant was the man who held a gun and announced the holdup. Under all the circumstances, there was a positive in-court identification made upon a factual basis independent from such photographic or lineup procedures. Under such circumstances, the in-court identification was proper. *State v. Johnson*, 536 S.W.2d 851, 854–855 (Mo.App.1976); *State v. Hall*, supra, 541 S.W.2d at 328.

We rule this point against appellant.

Second, appellant argues that Mr. Collins' testimony was improperly admitted because Mr. Collins "offered no testimony whatsoever which connected appellant with the crime committed against Collins" and could not and did not testify that he saw anyone rob Jacqueline Sharp. Collins' testimony should have been excluded, he argues, "since it encouraged the jury to draw the legally spurious conclusion that appellant was connected with the offense which Collins said was perpetrated against him."

◼ The well-established rule is that evidence of the commission of separate and distinct crimes is not admissible in evidence. *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (banc 1954); *State v. Wing*, 455 S.W.2d 457, 464 (Mo.1970), *cert. denied* 400 U.S. 1009, 91 S.Ct. 566, 27 L.Ed.2d 621; *State v. Lee*, 491 S.W.2d 317, 320 (Mo. banc 1973). The testimony of Mr. Collins here did not violate that well-established principle. The appellant was charged with "acting with another" in the robbery; the three men entered the lounge; the appellant went to the bar, asked for change, held a gun and announced a holdup; the other two men were at the other bar nearby. Under such circumstances, it was not necessary for Mr. Collins to offer testimony to connect appellant with the crime committed against him. The robbery by the three men was one continuous transaction. Under such circumstances, the testimony of Mr. Collins was admissible.

" . . . [W]here the circumstances are such as to constitute one continuous transaction in the accomplishment of a common design and the crimes are concurrent so that the proof of one cannot be made without a showing of the facts tending to establish the other, the entire facts may be admissible since they are regarded as part of the 'res gestae' and therefore all the facts may be admitted. In such circumstances the state is not required to nicely sift and separate the evidence and exclude the testimony tending to prove the crime for which the accused is not on trial when it forms a part of the 'res gestae' of the crime charged . . ."

*State v. Cox*, 508 S.W.2d 716, 723 (Mo.App. 1974); *State v. Griffin*, 497 S.W.2d 133, 134–135 (Mo.1973); *State v. Wilson*, 320 S.W.2d 525, 527 (Mo.1959); *State v. Peterson*, 543 S.W.2d 566, 568 (Mo.App.1976).

Third, appellant argues that it was error to permit the prosecutor to inquire on cross-

examination about appellant's prior arrests. On direct examination appellant testified that he had never been in trouble before, and on cross-examination the prosecutor inquired about his previous arrests for stealing and narcotic violations.

■ It is, of course, the general principle consistently applied that it is error to inquire on cross-examination about mere arrests of a witness or the defendant which have not resulted in a conviction. *State v. Rumfelt*, 258 S.W.2d 619, 619–620 (Mo.1953) and cases cited therein; *State v. Sanders*, 360 S.W.2d 722, 725 (Mo.1962).

". . . [T]he established rule [is] that a witness' credibility may not be attacked by showing a mere arrest, investigation, or criminal charge which has not resulted in a conviction. . . ."

*State v. Sanders*, supra, 360 S.W.2d at 725 [citing many decisions].

Appellant relies on *State v. Todd*, 468 S.W.2d 632 (Mo.1971) which adhered to this general principle and reversed and remanded the cause. In *Todd*, the defendant on direct examination gave a long narrative concerning occurrences on the occasion when he was arrested. In the course of the narrative he was asked if he had been arrested before. He answered " 'Yes.' " When asked on what charges he answered " 'Tickets or suspicion of burglary is all.' " *Id.* at 633. Thereafter, on cross-examination, the prosecutor was permitted to question him concerning fifteen prior arrests. Our Supreme Court reversed. "The fact that defendant made a brief voluntary reference to the subject of his arrests in his narrative testimony did not justify the flagrant violation of the rule . . . under the guise of explanatory cross-examination. . . ." *Id.* at 635.

*Todd* is not dispositive of the circumstances here.

Where the defendant in direct examination voluntarily opens up the subject that he is a person of good character and testifies that he has never been in any "trouble" before and hence is less likely to commit a crime than a person not of good character, it is permissible for the state to attempt to impeach the defendant's efforts to present to the jury a record of previous good conduct by showing prior arrests or criminal charges for the purpose of testing (a) whether he truthfully is a person of good character and (b) his trustworthiness and credibility as a witness in his own behalf.

In *State v. Elbert*, 471 S.W.2d 170 (Mo. 1971), the defendant on direct examination was asked by his counsel: " 'Now, Robert, you have been in trouble before, haven't you, with the police?' " He answered, " 'Yes, sir, I have, I got caught, couple fellows smoking marijuana.' " He was then asked whether that was the only time he had been in trouble and he replied, "Yes, sir." *Id.* at 171. On cross-examination the state inquired regarding prior arrests for peace disturbance, possession of marijuana and gambling. The Supreme Court held, citing *State v. Withers*, 347 S.W.2d 146 (Mo. 1961), that the cross-examination was, under the circumstances, proper as a permissible attempt to impeach appellant's effort to present to the jury a record of previous good conduct.

In *State v. Withers*, supra, 347 S.W.2d at 150, defendant was asked on direct examination: " 'Now I will ask you if prior to August 4, 1958, you had ever been arrested or in any kind of trouble?' " The defendant replied, " 'No, sir, I don't think so.' " He was again asked: " 'I will ask you, since August 4, 1958, to the present time, have you been in any trouble?' " The defendant replied, " 'No, sir.' " Thereafter on cross-examination he was asked whether he had been charged with other offenses in connection with his activities with young ladies. Our Supreme Court stated that ". . . the purpose of the [direct] interrogation was to lead the jury to believe that, with the exception of his admitted criminal misconduct [for which he was charged] defendant, both prior and subsequent thereto, had been a law-abiding person. . . ." *State v. Withers*, supra, 347 S.W.2d at 150. The court held that:

"We think it clear that under the circumstances here shown defendant sub-

jected himself to cross-examination as to any prior criminal misconduct or arrests for such misconduct for the purpose of testing in good faith, first, whether he truthfully was (as he had sought to induce the jury to believe) a person of good character (and, therefore, in law presumed less likely to commit a crime than a person not of good character) and, second, testing generally his trustworthiness and credibility as a witness in his own behalf. . . ."[1] *State v. Withers*, supra, 347 S.W.2d at 150–151.

Furthermore, while the established rule is that credibility may not be attacked by showing mere arrests, an accused, pursuant to § 546.260, RSMo., may be questioned during cross-examination as to any matter referred to in his examination in chief and ". . . this is particularly so when the purpose is to show his trustworthiness and credibility as a witness in his own behalf. . . ." *State v. Elbert*, supra, 471 S.W.2d at 172; *State v. Connell*, supra, 523 S.W.2d at 135, and discussion therein.

■ Therefore, under these principles of law established by judicial decisions and statute, we hold that under the circumstances here there was no error in permitting the state to attempt to impeach the appellant's credibility by showing prior arrests which were not so remote.

We rule this point against appellant.

Fourth, appellant argues that the court erred in failing to include the second paragraph of MAI–CR 2.10 in its instruction No. 5.[2] He relies on *State v. Vernor*, 522 S.W.2d 312, 316–317 (Mo.App.1975)—". . . Any deviation from the printed page [of MAI–CR] now constitutes error, the preju-

dicial effect of which is to be judicially determined. Rule 20.02(e). . . ." He argues that the court's failure to include the second paragraph prejudiced the appellant by making it possible for the jury to infer that his mere presence at the scene of the offense would be a sufficient basis for a finding of guilt.

■ Not every deviation from MAI–CR is prejudicial error. *State v. Vernor*, supra; *State v. Gaye*, 532 S.W.2d 783 (Mo. App.1975). However, here, there was no deviation from MAI–CR 2.10. There was sufficient evidence for the jury to conclude that the defendant was present at the scene of the offense and acted as principal in the offense. The defendant pulled a gun and announced the holdup. The instruction given informed the jury that "[a]ll persons are guilty who knowingly act together with the common purpose of committing an offense . . . and whatever one does in furtherance of the offense is the act of each of them." MAI–CR 2.10 is entitled "Parties: General Responsibility for the Conduct of Others." The second paragraph is designed and intended for circumstances where the responsibility of the defendant for an act is sought to be imposed because of the conduct of others which the defendant aids and encourages. In the absence of knowingly and intentionally aiding or encouraging others or in furtherance of the offense, mere presence is insufficient to make the defendant responsible. Thus the second paragraph is then required. But, when the defendant is a principal in the offense—here robbery—and knowingly acts with others for a common purpose of committing the offense, the second paragraph of MAI–CR 2.10 is not necessary.

1. See also *State v. White*, 313 S.W.2d 47, 54–55 (Mo.App.1958)—". . . After defendant voluntarily opened the subject of whether he had 'been in any trouble' since September 8, 1956 . . . certainly he could not complain of cross-examination on the same or related matters. . . ."; *State v. Duncan*, 254 S.W.2d 628 (Mo.1953)—where defendant brought the matter out on direct examination he cannot complain; *Cf. State v. Connell*, 523 S.W.2d 132 (Mo.App.1975)—defendant testi-

fied freely on direct examination as to arrests subsequent to convictions—not error to show arrests on numerous occasions prior to admitted convictions.

2. "The presence of a person at or near the scene of an offense at the time it was committed is alone not sufficient to make him responsible therefor, although his presence may be considered together with all of the evidence in determining his guilt or innocence."

Under the evidence here, the jury could not have been misled to believe that "appellant's mere presence at the scene of the offense would be sufficient basis for a finding of guilt." The jury was informed that all persons who act together with a common purpose of committing an offense are guilty. There was sufficient evidence that the three men entered the lounge and that the defendant acted as a principal. The verdict director, MAI–CR 7.62, was given which informed the jury to find the defendant guilty if he took property from Mrs. Sharp against her will by causing her to fear immediate injury to her person.

Furthermore, we do not believe that under the circumstances MAI–CR 2.10 was a necessary instruction. The state submitted its case to the jury on the basis that the defendant by means of a dangerous and deadly weapon took money from the possession of Mrs. Sharp by putting her in fear; the evidence all indicated that the defendant acted as a principal; there was an absence of evidence showing that the defendant was only an aider or encourager. See Note 4 of Notes on Use and *State v. Stewart*, 542 S.W.2d 533, 539 (Mo.App.1976). Since there was substantial evidence that defendant was a joint actor and a principal and not just an aider or encourager, it would not have been error not to have given MAI–CR 2.10. Since the whole instruction could have been omitted, the failure to include the second paragraph cannot therefore be prejudicial error. Note 4 to MAI–CR 2.10 states that the failure to use the instruction will not be deemed error even if there is substantial evidence the defendant was a joint actor "so long as there is no evidence that he was only an aider or encourager." There was no evidence here that the defendant was only an aider or encourager; in fact, there was substantial evidence that he was a joint actor and a principal. Under Note 4 the failure to give MAI–CR 2.10 could not have been error; therefore, the failure to use the second paragraph cannot be error.

Lastly, appellant contends that the court improperly took upon itself the duty of assessing punishment, thereby infringing on the appellant's right to have the jury deliberate and arrive at its verdict. He argues that, when the trial court submitted to the foreman and had the foreman sign a verdict form saying that the jury finds the defendant guilty but could not agree on punishment, the court erred because the procedure did not comport with the Court's duty to "give a jury ample time in which to try to resolve their differences about the degree of punishment and not be too hasty in assuming that burden . . . ." *State v. Burton*, 355 Mo. 792, 198 S.W.2d 19, 22 (1946).

When the jury returned from its deliberations after about an hour and forty-five minutes, it found the defendant guilty of robbery in the first degree by means of a dangerous and deadly weapon and fixed his punishment at seven years. A poll of the jurors indicated that not all of the jurors agreed on the punishment. The court did not accept the verdict and indicated that it would return the jury for further deliberations. The court told the jury at that time that if the persons could not agree "on the amount of time, you can return a verdict form which does not state the amount of time, and the Court will assess the punishment."

The court then questioned the foreman whether the jury agreed upon a verdict as to guilt or innocence; the foreman replied in the affirmative and that the verdict was guilty. The court then inquired, ". . . Now do I understand that this jury cannot agree upon the punishment?" The foreman answered, "True" and "We would like to rebolish [sic] it to the Court." At that point the court requested the clerk to provide a verdict form which instructed the defendant's guilt but that the jury could not agree on punishment and requested the foreman to sign the form. The foreman then signed the form indicating guilty but unable to agree on punishment; the jury was polled and all the jurors concurred in the verdict.

It is in this context that appellant complains that the court erred in taking upon

itself the duty of assessing punishment without giving it ample time to resolve the differences as to the degree of punishment thereby infringing upon the defendant's right to have the jury deliberate and arrive at a verdict in private.

While it is true a trial judge must give a jury ample time to resolve their differences about the degree of punishment and not be too hasty in assuming that burden, *State v. Burton*, supra, 198 S.W.2d at 22, much must be left to the discretion of the trial court. No exact standard can be laid down, nor should there be. Under the circumstances, we cannot conclude that there was an abuse of discretion. The members of the jury indicated that they had all agreed on a verdict of guilty but could not agree on punishment and relinquished their right to assess punishment. It was at that point that the court requested the foreman to sign the verdict form indicating that the jury found the defendant guilty but "cannot agree on punishment." We find no clear abuse of discretion in this procedure. See *State v. Hampton*, 317 S.W.2d 348, 353 (Mo.1958); *Cf. State v. Cain*, 507 S.W.2d 437, 442 (Mo.App. 1974).

We have read the entire transcript, the briefs and authorities relied upon. We are convinced that there is no prejudicial error and therefore affirm the judgment of conviction.

The judgment is affirmed.

KELLY and GUNN, JJ., concur.