STATE of Missouri, Respondent,

v.

Johnathan L. COLLIER, Appellant.

Johnathan L. COLLIER, Appellant,

v.

STATE of Missouri, Respondent.

Nos. WD 47604, WD 48773.

Missouri Court of Appeals,
Western District.

Dec. 13, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 31, 1995.

Application to Transfer Denied
March 21, 1995.

Robert G. Duncan, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cheryl A. Caponegro, Asst. Atty. Gen., Jefferson City, for respondent.

Before HANNA, P.J., and BRECKENRIDGE and ELLIS, JJ.

BRECKENRIDGE, Judge.

Johnathan L. Collier appeals his convictions for the class A felonies of murder in the first degree, § 565.020, RSMo Cum.Supp. 1993, and armed criminal action, § 571.015, RSMo 1986.[1] He was sentenced respectively to life imprisonment without eligibility for probation or parole, and to twenty-five years' imprisonment. Mr. Collier also appeals the denial of his Rule 29.15 post-conviction mo-

tion. Mr. Collier raises three points on appeal, claiming that the trial court (1) abused its discretion by overruling objections to testimony which brought out his earlier crimes and prison violations; (2) erred in denying his Rule 29.15 motion, which asserts that his defense counsel was ineffective in stipulating to his juvenile probation and in failing to object to evidence of Mr. Collier's juvenile adjudications and probation; and (3) committed prejudicial plain error in disallowing into evidence the remainder of the defendant's interview and statement to the police, after the State had elicited testimony about portions of those communications. The judgment is affirmed.

The evidence is viewed in the light most favorable to the verdict. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). In December 1990, Mr. Collier was seventeen years old and was on probation for juvenile offenses in Kansas. Several months earlier, he had become good friends with Roy Andrews, a twenty-four-year-old man who was on parole. Together, they devised a scheme that led to the crimes at issue.

Mr. Andrews was scheduled to see his parole officer, George Ranft, on December 6, 1990. Mr. Andrews told Mr. Collier that he was afraid his parole would be revoked at this meeting because he had recently lost his job and because he had been smoking marijuana. Mr. Collier was due to report to his probation officer, Candice Wagner, one day earlier than Mr. Andrews, on December 5, 1990. Mr. Collier told Mr. Andrews that he also believed he would be in trouble at his probation meeting, but did not explain why. The men then plotted how they could escape the potential repercussions of these meetings. They agreed that each one would frighten the other's parole or probation officer. The theory was that if the officers were scared badly enough, neither one would show up for work on the day of the respective meetings.

The first part of the scheme called for Mr. Andrews to hit and injure Mr. Collier's pro-

---

1. All statutory references are to Revised Missouri Statutes 1986, unless otherwise indicated.

bation officer, Candice Wagner. Because Ms. Wagner was a woman, the two believed that a strike would be sufficient to frighten her and keep her from work. The second part of the agreement required Mr. Collier to shoot through George Ranft's front door with a gun. They concluded that such an attack would be enough to scare Mr. Ranft so that he too would not come to work the next day.

Despite this plan, Mr. Andrews never completed his part of the agreement, and no assault occurred on Ms. Wagner. Mr. Collier then met with Probation Officer Wagner on December 5, 1990. Contrary to his earlier fears, however, he experienced no difficulties as a result of the meeting.

After Mr. Collier's appointment with Ms. Wagner, he drove to Mr. Andrews' residence. Although Mr. Andrews had failed to hit Mr. Collier's probation officer, Mr. Collier still planned to carry out the second part of the agreement. By the time he arrived at Mr. Andrews' home, Mr. Andrews had looked up the address of his parole officer in the telephone book, where it was listed as 5419 Oxford. Unknown to the defendant and Mr. Andrews, however, Officer Ranft no longer resided at that location.

Mr. Andrews drove himself and Mr. Collier to the general area in Raytown, Missouri where he believed his probation officer lived, and then stopped at a gas station for specific directions. While Mr. Andrews got gasoline, the defendant talked to a gas station attendant, who showed him where Oxford Street was on a map.

Once they arrived at Oxford Street, Mr. Andrews stopped the car so that Mr. Collier could retrieve from the trunk a .380 caliber handgun belonging to the defendant. Mr. Collier went up to the house while Mr. Andrews waited in the car with the engine running. The defendant rang the doorbell. When one of the new residents of 5419 Oxford, Duane "Pete" Jarrett, walked towards the entrance, the defendant fired one shot through the front door. Mr. Collier's shot fatally struck Mr. Jarrett in the chest. Mr. Collier then returned to the car, in which he and Mr. Andrews fled the scene.

On the way home, Mr. Andrews stopped the car so that Mr. Collier could return the gun to the trunk. The two then stopped at another filling station so that Mr. Andrews could call his parole officer's house to determine whether police were there. He believed that if police were present, it would signify that Mr. Ranft was truly scared, in which case he would stay home from work the next day. When someone answered the telephone, however, Mr. Andrews hung up. He attended his meeting the following day, where he saw Mr. Ranft. His parole was not revoked.

The defendant and Mr. Andrews first learned of the fatality through Mr. Andrews' sister. She told them that she had seen Mr. Collier's picture on television in connection with a killing. Mr. Andrews' mother, Mary Jane Andrews, also told the defendant about his picture and asked whether he was responsible for the shooting. According to her testimony, Mr. Collier admitted that he was the one who had shot the murdered man. During his court testimony, however, Mr. Collier repeatedly denied firing the fatal shot, and instead blamed Mr. Andrews.

### I.

██ As his first point on appeal, Mr. Collier argues that the trial court abused its discretion in overruling objections to cross-examination and to the testimony of Roy Andrews, insomuch as his testimony involved the defendant's prior crimes and prison violations. Mr. Collier maintains that this evidence was irrelevant and inadmissible, and that its resulting prejudice outweighed any probative value.

It should first be noted that Roy Andrews never testified as to prison violations. The defendant apparently confuses Mr. Andrews' testimony with that of Duane E. Page, a prisoner who was in jail at the same time as the defendant, Mr. Collier. Because, in his Point Relied On, the defendant challenges only his own cross-examination and the testimony of Mr. Andrews, we will limit our review to that portion of the record. *See* Rule 30.06(d)-(e); *Washington v. State,* 772 S.W.2d 728, 729 (Mo.App.1989).

■ The extent of cross-examination of an accused rests within the discretion of the trial court and will not be reversed absent the showing of a clear abuse of discretion. *State v. Hoopingarner*, 845 S.W.2d 89, 94 (Mo.App.1993). A defendant who testifies can be cross-examined and impeached like any other witness. *Id.; State v. Ford*, 623 S.W.2d 574, 575 (Mo.App.1981). In the court's discretion, specific acts of misconduct may be shown to discredit the defendant's veracity, regardless of whether those acts result in conviction. *Ford*, 623 S.W.2d at 575. However, a court cannot go into detail of the crimes leading to past convictions. *State v. Silcox*, 694 S.W.2d 755, 757 (Mo.App. 1985). These limitations are in place due to the risk that a jury will believe that prior convictions and misconduct are a sign of bad character, which is probative of guilt. *State v. Cleveland*, 583 S.W.2d 263, 267 (Mo.App. 1979).

■ By volunteering information regarding his good character, a defendant invites inquiry into mere arrests or investigations not resulting in conviction. *State v. Parson*, 815 S.W.2d 106, 109 (Mo.App.1991). In addition, when a defendant testifies that he has never been in any "trouble," he opens the door not only to prior arrests, *State v. Macon*, 547 S.W.2d 507, 514 (Mo.App.1977), but also to earlier acts of misconduct. *State v. Withers*, 347 S.W.2d 146, 150–51 (Mo.1961); *State v. Whitt*, 592 S.W.2d 316, 317 (Mo.App. 1979).

During direct examination, Mr. Collier denied participating in prior illicit activity:

Q. After a while, did you tell the police the truth as to what happened?

A. Yes.

Q. What did you tell them?

A. I basically told them from that point on. They kept questioning me. They was scaring me to death. *I never been in no trouble. I never done nothing wrong* ... I'm like it's better to be scared and tell the truth than be scared and end up in some kind of trouble.

(Emphasis added).

Because Mr. Collier claimed that he had never been in any trouble and that he had

never done anything wrong, the court allowed the prosecution to refute his statement by bringing in testimony of prior crimes and misconduct. In essence, it found that Mr. Collier had opened the door to further inquiry. On appeal, the defendant claims that this inquiry also brought out impermissible evidence of juvenile adjudication, thereby creating reversible error. We disagree.

The State scrutinized the defendant with respect to three types of evidence that we will review. First, it explored ownership of the murder weapon, since the defendant claimed that he never fired it and that it belonged to Mr. Andrews. Second, the State inquired into Mr. Collier's probation. And finally, it asked about his past criminal conduct, at which time the defendant admitted that he had jaywalked, stolen candy and shoplifted. We will address each category separately.

### The Murder Weapon

■ During trial, the defendant continually maintained that he never owned the .380 caliber handgun used to kill the victim and that he was not the trigger-man. To challenge this testimony, the prosecution extensively cross-examined Mr. Collier with regard to the gun and also recalled Roy Andrews to testify against the defendant.

Mr. Andrews stated that Mr. Collier did in fact own the .380 handgun and that the defendant claimed to have obtained it in a burglary. Mr. Andrews further testified that the defendant's girlfriend, Edith Halliburton, had become angry with Mr. Collier because he had brought the gun into her house. This clash with Ms. Halliburton prompted the defendant to take the .380 out of Ms. Halliburton's house and store it, as well as another gun, in the trunk of Mr. Andrews' car.

Mr. Andrews also reported that he and the defendant had used these same guns in 20–30 burglaries and robberies. He specifically recounted one incident in October, in which the two men were robbing a couple in a car, and the defendant shot through the car because the man refused to give up his wallet. The defendant objected to all this testimony as

inadmissible evidence of prior juvenile crimes, but the objection was overruled.

By statute, Missouri provides:

> After a child is taken into custody ... all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter, as well as all reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter.

§ 211.271.3, RSMo 1986. This statutory prohibition applies "not only to impeachment by means of the juvenile record itself, but also to any cross-examination on the subject of prior juvenile 'convictions.' " *State v. Thomas*, 536 S.W.2d 529, 531 (Mo.App.1976).[2] *See also State v. Tolias*, 326 S.W.2d 329, 333 (Mo.1959).

Although the defendant was a minor when the above incidents of burglary and robbery occurred, it appears that he was never subjected to juvenile proceedings for any of them. Nor were the questions on cross-examination designed to elicit statements made to juvenile authorities or matters pertaining to any juvenile proceedings. Therefore, the protection of the Juvenile Code does not apply. "[W]hile a witness may not be impeached by showing he has been convicted of a criminal offense in a juvenile court, he may be impeached by questions to which the answers affect his credibility as a witness albeit the questions relate to activities when the witness was a juvenile." *State v. Rising-er*, 546 S.W.2d 563, 566 (Mo.App.1977) (citations omitted).

■ Moreover, inquiry into ownership of a gun is permissible when a defendant claims that he does not possess the gun used in a crime. *State v. Harris*, 827 S.W.2d 255, 256 (Mo.App.1992) (holding that the state could cross-examine a sixteen-year-old murder defendant, certified to be tried as an adult, about prior possession of a firearm at

school when the murder weapon was a gun and the defendant testified that he had never had a gun); *see also State v. Weaver*, 591 S.W.2d 727, 730 (Mo.App.1979). Because Mr. Collier claimed he did not own the .380 caliber handgun, testimony refuting his story was admissible.

■ The defendant maintains that the prejudicial effect of some of the evidence associated with the gun outweighs its probative value because the evidence involves prior crimes. For example, the State elicited testimony that Mr. Collier had obtained the gun in a burglary and that he used the same gun in later burglaries and robberies. Although this evidence certainly touches on other crimes, it is admissible. When a defendant refers to his prior involvement with weapons, the evidence is permissible to contradict and impeach him concerning that subject. *State v. Parson*, 815 S.W.2d at 110.

■ Balancing the prejudicial effect and probative value of evidence lies within the sound discretion of the trial court. *State v. Mallett*, 732 S.W.2d 527, 534 (Mo. banc 1987), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). In this case, the defendant opened the door to this area of inquiry through his statement that he had never owned a gun or had a gun in Roy Andrews' car. Accordingly, we find that the court did not abuse its discretion.

### *Probationary Evidence*

■ The second category of evidence that Mr. Collier challenges results from inquiry into his juvenile probation. This merits little discussion. The defendant did not object when Mr. Andrews first testified about the plan to scare the probation officers, despite the fact that Mr. Andrews mentioned the defendant's probationary status at that time. In fact, the defendant volunteered the information that he was on probation for tampering with an automobile and that he has "had juvenile problems before in the past." "A defendant may not take advantage of self-invited error nor complain about mat-

---

**2.** A ruling against a defendant in juvenile court is not technically considered a criminal "conviction". § 211.271.1; *State v. Williams*, 473 S.W.2d 388, 389 (Mo.1971). Instead, it is called a juvenile adjudication. *See* § 211.271.1.

ters he himself brings into the case." *State v. Kelly,* 689 S.W.2d 639, 640 (Mo.App.1985). *See also Richardson v. State,* 617 S.W.2d 76, 77 (Mo.App.1981). Consequently, the trial court was within its realm of discretion in allowing this inquiry as well.

### Prior Criminal Conduct

Finally, the defendant challenges inquiry into prior criminal conduct unrelated to the gun or his probation. During cross-examination, the prosecutor twice asked Mr. Collier to discuss other juvenile adjudications in which he had been involved. The defendant objected, claiming that the juvenile statute forbid such questioning. His objection was rightly sustained both times, *see Tolias,* 326 S.W.2d at 333, and the judge instructed the jury to disregard the question. The prosecutor then inquired as to the defendant's prior "criminal conduct." The defendant admitted that he had jaywalked, stolen candy and shoplifted. It appears that Mr. Collier was under the jurisdiction of the juvenile court for shoplifting, though it is unclear whether the defendant was involved in an adjudication in the juvenile court for the other acts. Assuming that he was, these acts constitute the only evidence which potentially warrants the special juvenile protection of § 211.271.3. *See Risinger,* 546 S.W.2d at 566.

As discussed earlier, juvenile court matters are not proper evidence against a child. *State v. Williams,* 473 S.W.2d 388, 389 (Mo.1971). The ban on juvenile impeachment was created to protect minors so that they could be rehabilitated into society. *State v. Russell,* 625 S.W.2d 138, 142 (Mo. banc 1981). However, the shield is not absolute. A juvenile witness can be impeached with evidence of prior bad conduct in order to show bias, prejudice or ulterior motive, for example. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *Russell,* 625 S.W.2d at 140–42; *Van Orman v. State,* 704 S.W.2d 689, 690 (Mo. App.1986).

Although we find no Missouri case law specifically addressing the issue, we believe impeachment is also permissible when a juvenile defendant affirmatively asserts that the defendant has not been involved in prior acts of misconduct as evidence of good character, when such assertion is false. Certainly, adult defendants may be impeached when they mischaracterize events. *See Macon,* 547 S.W.2d at 514. To hold otherwise in the case of juveniles would allow them to commit perjury, safe in the assurance that they will never be challenged as to their veracity. Such a result would be unfair and illogical.

At least one other state has come to the same conclusion. *See Rhodes v. State,* 91 Nev. 720, 542 P.2d 196 (1975). In *Rhodes,* the Supreme Court of Nevada held that a prosecutor may question a defendant as to juvenile adjudications when the defendant has mischaracterized his juvenile record. *Id.* 542 P.2d at 197. *Rhodes* involved a defendant who was on trial for attempted murder. During his childhood, he had undergone juvenile adjudications and, in an apparent attempt to convince the jury of his honesty, told them that he had, in these earlier incidents, freely turned himself in to the juvenile authorities. *Id.* The prosecutor then impeached the defendant by asking whether he actually had been sent to the juvenile authorities because he had molested his sister; the prosecutor also presented rebuttal evidence of same. *Id.*

Mr. Rhodes claimed that the State's reference to his juvenile record was contrary to Nevada legislation prohibiting such evidence in proceedings against a minor. *Id.* The court rejected his contention, however, explaining that "the [juvenile] statute was never intended to aid and abet perjury.... When a defendant voluntarily, and in less than a truthful light, opens his juvenile record to the jury, he may not hide behind the protective shield of the statute." *Id.*

We agree with the reasoning in *Rhodes.* The statutory protection afforded to juveniles is extensive, but not absolute. Therefore, the balancing test set forth in the Missouri case of *Russell* is applied, as follows:

> The rehabilitative and protective purpose of the juvenile court system and public policy of this state providing confidentiality concerning juvenile offenses are factors which must be weighed in the necessity for permitting and the extent of cross-exami-

nation of juveniles. Such consideration will involve not only the factors relative to cross-examination of an adult, but will also involve elements particularly appropriate to a juvenile witness such as the circumstances of his misconduct, his subsequent conduct, and the age, understanding and background of the juvenile as they bear upon the probative value of the act of misconduct to impeach the juvenile.

*Russell,* 625 S.W.2d at 142.

The circumstances of Mr. Collier's case show that he opened the door by claiming that he had not done anything wrong. This is a factor that is taken into consideration. As with the defendant in *Rhodes,* such a statement amounts to perjury. Therefore, the trial court did not abuse its discretion in permitting the State to impeach Mr. Collier with prior acts of juvenile misconduct. Point denied.

## II.

■ In his second point on appeal, Johnathan Collier argues that the trial court erred in denying his Rule 29.15 motion for post-conviction relief without a hearing. Mr. Collier claims that he received ineffective assistance of counsel, since his attorney indirectly stipulated to the defendant's juvenile probation, and since he failed to object to certain testimony regarding Mr. Collier's juvenile adjudication and probation. It is the defendant's belief that such evidence was prejudicial and inadmissible under the Juvenile Code.

■ On review, we are limited to a determination of whether the lower court's findings of fact, conclusions of law and judgment are clearly erroneous. *State v. Starks,* 856 S.W.2d 334, 336 (Mo. banc 1993); Rule 29.15(j). The findings and conclusions will only be deemed clearly erroneous if, "after a review of the entire record, the appellate court is left with the 'definite and firm impression that a mistake has been made.'" *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987) (quoting *Stokes v. State,* 688 S.W.2d 19, 21 (Mo.App.1985)). The defendant confronts a heavy burden when challenging the presumption of competency of his or her counsel. *Id.* To be successful, the

defendant must show (1) that the attorney failed to use the skill and diligence of a reasonably competent attorney in a similar situation; and (2) that the defendant was prejudiced by that failure. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Sanders v. State,* 738 S.W.2d at 857. There is a strong presumption that the challenged action constitutes sound trial strategy, thereby rendering it reasonably skillful and diligent. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *Sanders,* 738 S.W.2d at 858. However, even if the defendant shows that counsel failed to operate in a professionally reasonable manner, the defendant will not succeed unless there is a reasonable probability that, in the absence of counsel's conduct, "the outcome of the proceeding would have been different." *Yoakum v. State,* 849 S.W.2d 685, 688 (Mo. App.1993).

Mr. Collier claims reversible error because his attorney, rather than objecting to evidence of the defendant's probation, stipulated to it. The stipulation reads as follows:

> The State of Missouri and defendant agree, or stipulate, that if called to testify, Candice ... Wagner ... would state that she is the juvenile officer who supervised Johnathan Collier in 1990, that he showed up as scheduled for an appointment on December 5th, 1990, and that he was not in danger of being revoked.

It is true that, in general, evidence of juvenile adjudications cannot be used against a child. *See* § 211.271. However, here such adjudications are not being exercised against Mr. Collier, but rather in his favor, as part of a sound trial strategy. Throughout his testimony, Mr. Collier denied ever being involved in a plan to scare the probation officers. This stipulation supports his testimony by demonstrating that Mr. Collier's supervision was not in danger of being revoked. Therefore, he would not have had any motive to shoot through the door of Mr. Andrew's parole officer.

■ Moreover, the defendant was not prejudiced by this stipulation because he agreed to it. Mr. Collier not only signed it, but immediately afterwards, testified under

oath that his lawyer had done everything he thought a reasonably competent lawyer could do under all the circumstances. He further testified that his lawyer had not failed to do anything the defendant had asked him to do.

Mr. Collier also contends that his attorney should have objected to the State's detailed questioning regarding this same probation. Specifically, the State brought out the fact that Mr. Collier was on probation for felony theft and felony criminal damage due to motor vehicle tampering. Although the defendant's attorney failed to object, such an omission is not clearly erroneous. It is a reasonable trial strategy to allow such evidence into the record, since the jury might otherwise surmise that Mr. Collier had been on probation for a much more serious crime. The second point is denied.

### III.

Mr. Collier asserts in his third point that the trial court committed plain error in not allowing into evidence the remainder of his interview and statement to the police after the prosecutor first elicited testimony regarding parts of his interview and statement. According to Rule 29.11(d), "allegations of error to be preserved for appellate review must be included in a motion for new trial...." The defendant admits that he did not raise this point in his motion for a new trial. Therefore, this issue is confined to a review for plain error. Rule 30.20. To be entitled to relief for plain error, the defendant must prove that the trial court's action was not simply faulty, but that it "so substantially impacted upon his rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected." *State v. Shaline,* 793 S.W.2d 167, 170 (Mo.App.1990).

From the record, it appears that the defendant signed a seven-page police statement derived from a videoed statement he gave at the police station. Detective Joe Langer, who questioned Mr. Collier, also dictated a summary of the defendant's entire interrogation to serve as a police report. The detective was called as a witness at trial and his testimony came from an amalgamation of Mr.

Collier's statement and the detective's report, though neither document was admitted into evidence.

According to the testimony of Detective Langer, Mr. Collier initially told the police that he had been with his girlfriend, Edith Halliburton, and her family when the murder took place. However, after the police pointed out his resemblance to a composite drawing of the murder suspect and told him that a confidential informant had turned him in, Mr. Collier admitted to his presence at the murder scene.

During the cross-examination of Detective Langer, the defendant attempted to elicit testimony concerning the rest of the seven-page statement in order to show that, although Mr. Collier had made some contradictory statements, he always denied firing the fatal shot. The defendant claimed that he should be able to bring in the statement in its entirety since the prosecutor used part of it to impeach Mr. Collier. The prosecutor objected, however, asserting that the defense could not utilize prior consistent statements to rehabilitate the defendant. The court sustained the objection as follows:

[DEFENSE ATTORNEY]: You can't bring out just part of a man's statement. He told him only part of the statement that he made. He made a statement at first that, like he testified here, and then he made another statement and then they videoed it telling everything. My point is they can't just use part of the statement and preclude me. If they don't want to use any of it, I can't get into it. That's the problem.

[COURT]: Well, I still don't understand what it is you intend to do with the statement.

[DEFENSE ATTORNEY]: I'll show you. I want to show that he told the officer that he went to the house and [Mr. Andrews] shot [the victim].

[COURT]: No, no, no, you can't do that.

[DEFENSE ATTORNEY]: That's what I wanted.

[COURT]: Objection is sustained.[3]

---

3. The prosecutor used Mr. Collier's initial police     statement to impeach a second part of the defen-

■ The general rule is that a prior consistent statement is admissible to rebut impeachment manifested through a prior inconsistent statement. *State v. Clark*, 711 S.W.2d 928, 933 (Mo.App.1986). However, the consistent statement cannot surpass the scope of the initial impeachment. *Id.* If it brings up new matters, it is incompetent and inadmissible. *Id.* The prosecution used Mr. Collier's two statements to impeach his credibility generally by showing that he first told the police one story and then admitted he lied. Mr. Collier's prior statements were not specifically used to impeach his claim of not shooting the victim. Therefore, his prior statements could be considered outside the strict scope of impeachment.

■ Nonetheless, when the State introduces part of a confession or admission into evidence, the defendant is authorized to introduce the remaining portion, although it may be self-serving. *State v. Quinn*, 461 S.W.2d 812, 816 (Mo.1970); *see also State v. Easley*, 662 S.W.2d 248, 252 (Mo. banc 1983). "A confession . . . must be used in its entirety so that the person affected thereby may have the benefit of any exculpation that the whole statement may afford." *State v. Beatty*, 849 S.W.2d 56, 59 (Mo.App.1993) (quoting *State v. Clay*, 441 So.2d 1227, 1234 (La.App. 1983)). As *Beatty* explains,

> relevant exculpatory statements made during a confession are admissible if other portions of the confession are used by the prosecution. "The ancient rule in this Commonwealth is that the prosecution has no right to introduce selected portions of a defendant's confession and exclude those which tend to mitigate, justify, or excuse the offense charged."

*Id.* (quoting *Boggs v. Commonwealth*, 229 Va. 501, 331 S.E.2d 407, 419 (1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1240, 89

L.Ed.2d 347 (1986)). Although Mr. Collier's statement was not a confession,[4] it was an admission which falls under this rule of completeness. "An admission is the statement or conduct of a party that tends to incriminate or connect [that party] with the crime charged, or which manifests a consciousness of guilt." *State v. Isa*, 850 S.W.2d 876, 894 (Mo. banc 1993). To qualify as an admission, a statement need not constitute an express acknowledgment of guilt. *Id.; State v. Boyington*, 831 S.W.2d 642, 645 (Mo.App.1992). Instead, the court must appraise the defendant's statement in light of the circumstances surrounding it. *Isa*, 850 S.W.2d at 894.

Mr. Collier's statement was an admission, in that Mr. Collier conceded that he had been present at the murder scene and, at the very least, witnessed the murder. It appears, therefore, that the court erred in disallowing the entirety of Mr. Collier's statements. Since the jury heard the defendant's prior inconsistent statement regarding his involvement, evidence that he knew nothing about a plan to scare Mr. Andrews' probation officer and consistently denied pulling the trigger would have been exculpatory. Nonetheless, the failure to allow testimony describing the remainder of Mr. Collier's statement does not necessarily establish plain error, as manifest injustice must have resulted from the failure.

■ The purpose of the rule of completeness is to ensure that a statement is not admitted out of context, and the rule "is violated only when admission of the statement in an edited form distorts the meaning of the statement or excludes information which is *substantially* exculpatory to declarant. . . ." 23 C.J.S. *Criminal Law* § 885 (1989) (emphasis added). When such a risk is absent, however, "it is not an abuse of discretion to fail to require the production of

---

dant's story as well. Mr. Collier initially told the police that he saw the victim's arms fly up once he was hit with the bullet. However, during trial, he testified that he never observed such movement. The prosecutor referred to the foregoing police statement in order to show inconsistencies. On redirect, the defendant again argued that he should be able to introduce the entire statement if the prosecutor used part, but the State's objection was again sustained.

4. A confession is:

> [a] voluntary statement made by a person charged with the commission of a crime or misdemeanor, communicated to another person, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act or the share and participation which he had in it.

Black's Law Dictionary 296 (6th ed. 1990).

the remainder [of the statement]...." *Id.* Disallowing Mr. Collier's prior consistent statement did not impact upon his rights so substantially as to create manifest injustice or a miscarriage of justice. *See Shaline,* 793 S.W.2d at 170.

Although the admission of the remainder of Mr. Collier's statement would have been exculpatory, it would not have been *substantially* exculpatory. The jury heard Mr. Collier's testimony at trial when Mr. Collier stated (1) that he and Mr. Andrews did not form an agreement to scare each other's probation or parole officer, (2) that Mr. Collier thought Mr. Andrews was going to give the gun to a friend of Mr. Andrews at 5419 Oxford and (3) that Mr. Collier did not shoot the victim. Mr. Collier further testified that when he gave the police the second explanation of what happened on December 5, 1990, "I told them the truth what I told you all today, the whole events of what happened." It is only logical for the jury to have ascertained that Mr. Collier denied firing the weapon in his second statement to the police. After all, if Mr. Collier had admitted otherwise, the State surely would have revealed his confession to the jury.

Moreover, the prior consistent statement was not necessary to place the State's evidence in context. The State was merely attempting to highlight inconsistencies in Mr. Collier's story. It was not distorting the facts, in that the State did not use the statement to specifically claim that Mr. Collier had pulled the trigger. The State was only casting doubt on Mr. Collier's credibility.

The evidence showed that Mr. Collier had changed his story, and any inference that he was guilty came from the resulting inconsistencies. It is unlikely that the inference would have been noticeably different if the jury had been expressly told that, in his contradictory statement, Mr. Collier regularly maintained that he was not the triggerman. The jury had already heard Mr. Collier's claim of innocence during his own testimony at trial and was also informed that Mr. Collier related to the police the same information to which he had testified at trial. Therefore, the excluded portion of the statement would not have played a such significant role in the defense's theory as to create manifest injustice.

Point denied.

The judgment is affirmed.

All concur.