**STATE of Missouri, Respondent,**

v.

**George Lester FOGLE, Appellant.**

**No. WD 38690.**

Missouri Court of Appeals,
Western District.

Sept. 15, 1987.

Motion for Rehearing and/or
Transfer to Supreme Court Denied
Oct. 27, 1987.

Application to Transfer Denied
Dec. 15, 1987.

2. Respondent's motions to strike appellant's    brief and to dismiss the appeal are denied.

Charles M. Shaw, Clayton, for appellant.

William L. Webster, Atty. Gen., Carrie Francke, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

Before BERREY, P.J., and KENNEDY and LOWENSTEIN, JJ.

BERREY, Presiding Judge.

Defendant was charged as a prior offender with conspiracy to steal property of a value of at least $150 by means of deceit, a class D felony. The trial court found defendant to be a prior offender pursuant to § 558.016 RSMo 1986, and the jury found him guilty of the charged offense. He was sentenced to four (4) years imprisonment in the State Department of Corrections. He now appeals his conviction and sentence.

In November 1982, Ina Clair Easdale and her husband, lived on a farm in Shelby County, Missouri, and wrote a $10,000 check to Lucas Everett for the installation of lightning rods. On the evening of April 7, 1983, the Easdales received a phone call from an adult male. Mrs. Easdale answered the phone and the caller asked to speak to Mr. Easdale. Mr. Easdale, who died in December 1985, prior to defendant's July 1986, trial, made notes of this telephone conversation which were admitted over defendant's objection.

Jane Gaines, who was on a party line with the Easdales eavesdropped on the telephone conversation the evening of April 7, and overheard the conversation between Mr. Easdale, a person whose voice she knew and recognized, and a person identifying himself as John Robbins. In this conversation, Robbins said he was going to send two men named Bates and Robinson out the next day to inspect the Easdales' lightning rods in order to get a warranty. Robbins described one of them as having a limp and Mr. Easdale said that he knew who he was as he had met him before. Robbins gave Easdale a computer number and a telephone number to give to anyone who asked about the lightning rods. Robbins stated that although the men would be inspecting for a warranty, they would also install any additional cable which was needed.

Based upon her husband's remarks about the telephone conversation, Mrs. Easdale testified she expected a Mr. Robinson and Mr. Bates to come to their house in the morning. Before the arrival of Robinson and Bates, at 8:30 a.m., on April 8, 1983,

the Easdales received a call from an adult male; Mrs. Easdale could not say for sure this was the same caller from the evening before. The phone records introduced into evidence showed a call charged to the credit card of one Jimmy Rickey from Hardee's Drive-In in Hannibal to the Easdale residence. The caller was told that Robinson and Bates had not yet arrived.

According to Gaines, the following morning at 8:25 a.m., by her clock, she listened in on another conversation between Mr. Easdale and Robbins; she stated it was the same voice she had heard the night before. Robbins wanted to know if his men had gotten there yet, and after Mr. Easdale said no, Robbins said he would call back later.

Mrs. Easdale testified that at approximately 9:00 a.m. she received another telephone call from the same caller as the 8:30 a.m. call and that he asked to speak to Mr. Bates, who then got on the phone; Bates and Robinson arrived at the Easdale home sometime after the 8:30 a.m. call. The phone records show that at 8:53 a.m. there was a credit card call again billed to Jimmy Rickey's credit card from the Missouri Division of Tourism on Highway 61 in Hannibal to the Easdale residence. Similar calls were made at 10:03 a.m. and 1:03 p.m.

Gaines, who was still listening in on the party line, recognized Robbins during the 9:00 a.m. telephone call. According to Gaines, Robbins asked to talk to Bates and a man identifying himself as Bates got on the line. Robbins asked Bates how much wire he was going to use and how much he was going to charge. Bates told Robbins that Easdale claimed he had no money. Gaines testified Robbins stated, " 'He has got plenty of money; all he has to do is get it,' " and that " 'this is going to be our last go-around.' " Robbins instructed Bates to charge $14.50 a foot for the cable. Bates was to explain to Mr. Easdale that the other company had not done it right and that they charged more to do it. Robbins said to tell Easdale there would be a twenty percent reduction in price if he paid by cashier's check. Robbins asked Bates if he

thought he could "handle the job" and Bates stated he could. Robbins directed him to go out and inspect and to use 300 or 400 feet of cable; he was to stay on the job as long as he needed to keep Easdale happy. Gaines stated Robbins used the words "fool around."

Gaines also listened to the 10:03 a.m. telephone conversation between Robbins and Bates. Gaines testified Bates stated the job was about half inspected and that the other company had just laid cable on top of the roof with no connectors and that there was some paint on the cables; Bates stated if that wasn't fixed no warranty could be given. Robbins responded that "this is a good one; let's get it done today; get all you can." According to Gaines, Robbins then stated " 'don't have any mercy on him.' " Robbins then instructed Bates to bring the Easdale check made to Lucas Everett back to him. Bates was to tell the Easdales that the copying machine in the truck had broken down.

Mrs. Easdale testified that after their arrival, Robinson and Bates crawled on the Easdales' house and out buildings to inspect the lightning rods. Bates indicated to the Easdales that there was a problem with the paint on the lightning rods and the wires and, as a consequence, there needed to be new wiring. Mrs. Easdale also stated the men wanted her and her husband to give them the cancelled check made to Everett Lucas for the payment of the installation of the rods so they could make a copy. The men stated they wanted to get a copy of the check so they could try to get a refund for the Easdales. Mrs. Easdale testified the men also told her that their copy machine in their truck had broken down; Mrs. Easdale then gave the original cancelled check to Mr. Bates, a man she described as having a limp.

Gerald Gander, the Sheriff of Shelby County, arrived at the Easdales' at approximately 10:30 a.m.[1] and found Robinson on the roof of the house and Bates rolling some cable up on a wooden spool. He took these men into custody. Gaines testified in

1. The Sheriff was notified by Jane Gaines' husband.

another call at approximately 1:00 p.m., Robbins talked to Mr. Easdale who informed Robbins that the Sheriff had come and picked up Robinson and Bates.

At 2:14 p.m., a call was made to the Easdales, charged to Rickey's credit card from the Division of Tourism; Mrs. Easdale answered and recognized the same adult male voice. She handed the phone to Mr. Easdale who turned it over to Sheriff Gander, who had returned to the Easdales. The caller identified himself as John Robbins and asked the sheriff if he had his men in custody. The sheriff responded affirmatively and stated that he was going to hold the men until he found out what was going on.

Sheriff Gander testified later that day he received another telephone call at the Shelby County Sheriff's office at approximately 4:30 p.m. and the caller identified himself as an attorney for John Robbins; the phone records revealed a phone call from the phone of Phyllis Fogle, defendant's wife; the call was billed to the Fogle number. The sheriff testified the caller had the same voice as the one he had just talked to at the Easdales. The caller asked if he was holding some of Robbins' workmen and if they were going to be charged. The sheriff told him the men would be charged and that they would be able to call an attorney within the next few minutes. At 5:04 p.m., the telephone records showed a collect call to Phyllis Fogle's number from the sheriff's office.

The sheriff identified George Fogle, the defendant in the courtroom.[2] He stated that in October 1983, he left word for George Fogle to contact him in regard to a subpoena. A man identifying himself as George Fogle returned the sheriff's call. The sheriff identified defendant Fogle as having the same voice as John Robbins and John Robbins' attorney with whom he spoke on April 8, 1983. He stated that in December of 1985 he again spoke with the defendant and his voice was the same he had heard in April 1983.

Kent Kattelman, a general contractor in the area, testified to the value of the equipment installed at the Easdale property. He stated that based on his experience the fair market value of the equipment was $2,226.00 and that the labor cost for the installation of the system would be $256.00. With a reasonable profit margin of 20 per cent, he estimated the total cost of the project at the Easdales' would be $2,979.29. He also testified that the cost of cable was less than $1.50 per foot. He further opined that paint has no effect on the cables.

On appeal defendant asserts nine points of error. They are: (1) the trial court erred in allowing Mrs. Ian Easdale to testify to hearsay statements of Bates and Robinson (Point III); (2) the trial court erred in permitting the voice identification of Sheriff Gander (Point VI); (3) the trial court erred in allowing into evidence State exhibits 5A, B and C, the notes of Jane Gaines (Point I), State exhibits 4A and B, the notes of Mr. William O. Easdale (Point II) and State exhibit 10, a copy of the $10,000 check made to Lucas Everett (Point VII); (4) the trial court erred in allowing Kattelman to testify as an expert as to the value of the lightning rod system (Point VI); (5) the lack of sufficient evidence to support the conviction (Point IX); (6) the trial court erred in allowing Gaines' testimony in violation of federal law which protects privacy rights in oral and wire communications (Point VII); and (7) the trial court erred in overruling defendant's objection to the State's closing argument (Point V).

## I

■ Defendant alleges error by the trial court in overruling his objection to the testimony of Mrs. Easdale regarding statements made by Bates and Robinson because such was hearsay and there was no proof of conspiracy. Declarations of co-conspirators made in the furtherance of a conspiracy are admissible as an exception to the hearsay rule. *State v. Dudley,* 724 S.W.2d 517, 520 (Mo.App.1986). The obli-

---

**2.** Mrs. Easdale also identified defendant George Fogle. She stated defendant had been to her home on several occasions.

gation of the trial court in ruling on the admittance of this hearsay evidence was stated in *State v. Fuhr*, 660 S.W.2d 443, 447 (Mo.App.1983):

> In ruling on admissibility, the trial judge must first determine whether any evidence of conspiracy appears, whether by direct and positive proof or by inference from the facts and circumstances in evidence. To justify admission of such statement of a co-conspirator, the proof in the first place need only satisfy the trial judge of the prima facie existence of the conspiracy. If the trial judge, in making his preliminary decision on admissibility, has grounds to find by a preponderance of the independent evidence that the defendant and the declarant were members of a conspiracy, and that the declaration was made during the course and in furtherance of the conspiracy he may admit testimony as to the declaration (citations omitted).

■ Although proof of conspiracy should come before the declaration of the co-conspirator the order of proof is largely within the discretion of the trial court. *State v. Danforth*, 654 S.W.2d 912, 921 (Mo.App.1983).

■ The crime of conspiracy is an agreement by two or more to commit a crime, § 564.016 RSMo 1986; *State v. Fetty*, 654 S.W.2d 150, 153 (Mo.App.1983), and the evidence adequately established an agreement to steal by deceit. The evidence showed that defendant (aka John Robbins) and Bates had been previously identified at the Easdales' home; that the Easdales paid $10,000 for the installation of a lightning rod system worth approximately $3,000; that Bates and Robinson returned to the Easdales to do more "work" on this newly installed system; and that Bates and Robinson were acting under the direction of and in agreement with defendant as seen through the existence of the telephone communications and their subsequent actions. From this evidence, we find the trial court did not abuse its discretion in the admittance of the hearsay testimony.

## II

■ Defendant attacks the testimony of Sheriff Gander in which he identified the voice of defendant to be the same as the caller on April 7 and 8. Defendant asserts there was no proper identification that he was the caller. We disagree. The Supreme Court in *State v. McGee*, 336 Mo. 1082, 83 S.W.2d 98, 106 (1935), states that the admissibility of this evidence is dependent upon the identification of the speaker and its weight and value upon the witness' opportunity to identify the speaker. *See also State v. Berezuk*, 331 Mo. 626, 55 S.W.2d 949, 952 (1932); *State v. Gragg*, 606 S.W.2d 252, 254 (Mo.App.1980). The identity of the caller may be shown by the circumstances surrounding the telephone conversation although the receiver of the call cannot identify the voice. *Id.* Here, in October of 1983, a caller identifying himself as George Fogle called the sheriff; the sheriff had left word for George Fogle to call him in regard to a subpoena. Again, in December 1985, the sheriff met and spoke with defendant, and thereafter spoke with defendant weekly on the phone as a requirement of defendant's bond. The sheriff testified the caller identifying himself as John Robbins and John Robbins' attorney in the telephone conversations on April 8, 1983, had the same voice as the defendant with whom he spoke in October 1983, and December 1985. The sheriff's recognition of defendant's voice, acquired after the conversations in issue, does not prevent a proper identification of the speaker of those calls. *See State v. Bradley*, 352 Mo. 780, 179 S.W.2d 98, 101 (Mo.1944).

## III

Defendant in his Point I, II and III contends the trial court prejudicially erred in overruling defendant's objections to the introduction into evidence of state exhibits 5A, B and C, 4A, and B; and exhibit 10. For reasons to be discussed, we find the admittance of the exhibits do not warrant reversal.

■ Defendant argues that exhibit 5A, B and C, the handwritten notes of Jane Gaines which she took while eavesdropping

on the telephone, were erroneously admitted as hearsay and prejudicially cumulative. Janes Gaines testified she listened to the telephone conversations between defendant (aka Robbins) and Mr. Easdale and Mr. Bates on April 7 and 8. Gaines' testimony comes within the hearsay exception that statements made by a co-conspiritator in the furtherance of a conspiracy are admissible. *See State v. Dudley, supra,* 724 S.W.2d at 520.

■■■■ Gaines' notes, made contemporaneously with the telephone conversations, were used during her testimony to aid in her recollection of some of the details of the conversations such as the computer number and telephone number that defendant (aka Robbins) gave to Mr. Easdale. Under certain circumstances, a witness who does not recall or is uncertain about matters he is about to testify may be permitted to refresh his memory by referring to a memorandum or writing. *Reproductive Health Services, Inc. v. Lee,* 660 S.W.2d 330 (Mo.App.1983). Gaines testified that if she looked at her notes, it would help her recollection of these details; thus, a satisfactory foundation was made for the trial court to allow Gaines to refresh her memory. *See Id.* at 336. It should be noted, however, that "[t]he party whose witness uses the data to refresh his memory has no right to have the same read to or handed to the jury." *State v. Patton,* 255 Mo. 245, 164 S.W.223, 226 (1914); *see also Willitts v. Chicago B. & Q. R. Co.,* 221 S.W. 65, 66 (Mo.1920). It is the recollection of the witness that is in evidence not the memorandum.[3] *State v. Patton, supra,* 164 S.W. at 226. The writing is relatively unimportant for evidentiary proof. *Reproductive Health Services, Inc. v. Lee, supra,* 660 S.W.2d at 336. Thus, the trial court erred in the admission of the exhibits. This error, however, was harmless; *State ex rel. Webb v. King,* 73 S.W.2d 460, 461 (Mo.App.1934); *Whitley v. Stein,* 34 S.W.2d 998, 1000 (Mo.App.1931), and the defendant was not thereby prejudiced as

these notes were merely cumulative to the testimony of Jane Gaines. *See State v. Smith,* 477 S.W.2d 67, 71 (Mo.1972).

■■■■ Defendant similarly submits the trial court erred in admitting the handwritten notes of William Easdale as they are hearsay and do not come within any recognized exception. Mr. Easdale, who died before the time of trial, made notes while he was talking to defendant (aka Robbins) on April 7 and 8 as testified by Mrs. Easdale; she identified the notes as being in his handwriting.

Defendant failed to provide this court with a copy of these notes and they were not read into evidence and incorporated as part of the transcript. Rule 82.12 provides that the record shall include all evidence which is "necessary to the determination of all questions presented," and a failure to do so prevents the matter from being considered on appeal. *State v. Matthews,* 512 S.W.2d 248, 249 (Mo.App.1974). Here, the trial court had an opportunity to review this evidence at trial and to reconsider its decision admitting the notes into evidence on a motion for new trial; the trial court sits in a better position than this court to evaluate the potential prejudice of this evidence. *State v. Kenley,* 693 S.W.2d 79, 81 (Mo. banc 1985). Defendant's allegation of error is denied.

■■■■ Finally, defendant attacks the trial court's allowance of the introduction of state's exhibit 10, the $10,000 check made payable to Lucas Everett from the Easdales, and the testimony regarding the copy of the check by Bates and Robinson because it was evidence of another uncharged crime. Although evidence of this nature is often deemed prejudicial and inadmissible because it could result in a conviction founded upon crimes of which a defendant is not accused, it may be allowed where it "tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commis-

---

**3.** This situation should not be confused with the doctrine of past recollection recorded where the witness vouches for the veracity of the writing but has no independent recollection of the facts.

The writing itself becomes competent evidence for proof of fact. *Watson v. Meredith Development Company,* 410 S.W.2d 338, 341 (Mo.App. 1966); *State v. Patton, supra,* 164 S.W. at 226.

**224**

sion of two or more crimes so related that proof of one tends to establish the other, or the identity of the person charged" with the crime. *State v. Trimble*, 638 S.W.2d 726, 732 (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983). Additionally, when two or more crimes are so interconnected as to time or circumstances, often one cannot be fully shown without proving the other. *State v. Clark*, 711 S.W.2d 928, 934 (Mo.App.1986). In the case at bar, evidence of the conspiracy to steal by deceit with regard to the installation of the new wiring was tied to the evidence of the previous installation of a new lightning rod system. We find no error by its admittance.

## IV

■ Defendant urges this court to find the testimony of Kent Kattelman not competent as expert opinion. Defendant charges Kattelman was inexperienced and unqualified to testify to the value of the lightning rod systems because he had installed only three systems in eleven years —the last one was installed a year and a half prior to trial. Preliminarily, it should be noted that the admission of testimony by an expert resides within the sound discretion of the trial court. *State v. Marks*, 721 S.W.2d 51, 55 (Mo.App.1986). This court in *State v. Williams*, 635 S.W.2d 55, 59 (Mo.App.1983), set forth the rule on the qualifications needed to be an expert witness:

> To qualify as a witness of value, one need not be an expert in the usual sense of the word. It suffices that the witness knows the property and possesses information and knowledge so as to enable him to form an intelligent judgment. "[If this knowledge and information is superior to that possessed by the ordinary person who composes the jury, then he should be permitted to testify." Thus, the only true criterion propounds this relative test: "On *this subject* can a jury from *this person* receive appreciable help?" (Citations supplied.)

(Emphasis omitted.) In *State v. Williams, supra,* the defendant was charged with receiving stolen property of a value of $150 or more; the property received consisted of two electric typewriters taken from a high school. These were valued by the high school official at $385 and $375. An undercover agent testified the typewriters had a value of $325 and $375; he based his opinion on the personal purchase of an electric typewriter—a different brand than the two stolen typewriters—two years earlier. The *Williams* court found this testimony was admissible as expert testimony.

■ Here Kattelman testified he had installed lightning system on three separate occasions; that he was familiar with the purchase of the materials involved with lightning rod systems; and that he had made an independent inspection of the Easdales' system. This information and knowledge acquired by Kattelman is superior to those who comprise the average jury and would be helpful to them in making their assessments. We find there was a sufficient basis for this testimony and that the trial court did not abuse its discretion by allowing Kattelman's testimony.

## V

Defendant challenges the sufficiency of the evidence to support his conviction. Specifically, he charges there was insufficient evidence to connect him to the telephone calls made to the Easdales' house. In determining whether there is sufficient evidence to sustain a conviction, this court must accept as true all evidence, direct and circumstantial, and all reasonable inferences which are most favorable to the state and disregard the evidence, direct and circumstantial, and all reasonable inferences which are most favorable to the state and disregard the evidence and inferences contrary to a finding of guilt. *State v. Garrett*, 627 S.W.2d 635, 642 (Mo. banc 1982), *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *State v. Dudley, supra,* 724 S.W.2d at 520. The reviewing court will not weigh the evidence nor judge the credibility of the witnesses; review is limited to determining if there was sufficient evidence to find defendant guilty be-

yond a reasonable doubt. *State v. Scott,* 699 S.W.2d 760, 765 (Mo.App.1985).

■ As previously mentioned, Sheriff Gander positively identified defendant's voice as being the same voice he had spoken with on April 8, 1981, at the Easdale's home and at the sheriff's office. Mrs. Easdale and Jane Gaines both testified the caller identifying himself as John Robbins had the same voice each time he called. Telephone records read into evidence showed several calls were made to the Easdale's home from various locations along Highway 61 in Hannibal—in close proximity to defendant's home. Additionally, the 3:16 p.m. and 4:27 p.m. calls made to the sheriff's office on April 8, 1983, were made from the home of Phyllis Fogle, defendant's wife. This evidence sufficiently connected defendant to the calls made.

The testimony of Jane Gaines revealed the plan by the defendant and his conspirators to tell the Easdales that the previous company had not installed the system right and that the paint on the cables would cause problems; that defendant (aka Robbins) thought Easdales had "plenty of money;" that upon defendant's (aka Robbins) instruction, Bates and Robinson were to "fool around" and "look like [they] were inspecting" to keep Mr. Easdale happy. From the testimony of Kent Kattelman the evidence showed that paint on lightning rod cables does not cause problems and that the cost of cable was *less* that $1.50 per foot—an amount much less than the quoted price of $14.50 per foot by the conspirators. The evidence as recited was more than sufficient to establish conspiracy to steal by deceit.

### VI

■ Defendant alleges Jane Gaines' testimony was prejudicial and thus, inadmissible, because Jane Gaines violated the Easdales' privacy rights guaranteed against unreasonable searches and seizures granted by the Fourth Amendment, and the federal statute prohibiting the interception of oral communications under 18 U.S. C. § 2515, through her eavesdropping.[4] We find defendant's point to be meritless. First, defendant cannot vicariously assert the Fourth Amendment rights of a third person. *Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978); *see also State v. Wood,* 613 S.W.2d 898, 900 (Mo.App.1981). Secondly, defendant's assertion that Gaines' testimony should be excluded under 18 U.S.C. § 2515 fails because it has been defendant's position throughout this criminal action that there is no proof that he was a party to those telephone conversations—a requirement for an "aggrieved person" under the statute. *See* 18 U.S.C. § 2510(11). *People v. Warner,* 401 Mich. 186, 258 S.W.2d 385, 392 [6–10] (1977).

### VII

Finally, it is asserted that the trial court prejudicially erred in overruling defendant's objection to the state's closing argument on rebuttal:

Aren't you truly convinced that he was involved in this crime? Because if you are, you will not be able in conscience or in law to find him not guilty.

Why should you be firmly convinced? If Mr. Duncan used the word fact once he use it a dozen times. I have no quarrel with that. That's what I was trying to present to you, but the fact of the matter is, you can't expect me to come up with an eye witness on a conspiracy case. It's pretty tough to do.

Do you think these fellows want to come in here and rat on each other. Forget it. That ain't the way it works. I guess maybe there truly is honor among thieves. I don't know. There is honor in their sense.

4. **18 U.S.C. § 2515. Prohibition of use as evidence of intercepted wire or oral communications**
Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

Defendant contends that the prosecutor's comments were objectionable because they were an indirect reference to defendant's failure to testify and that, with the appearance of defendant's co-conspirators "shackled and in prison clothing," these comments created "an impermissible inference of guilt, predetermined by association."

The trial court is given wide latitude in controlling closing arguments; only when the argument is plainly unwarranted and has a prejudicial effect on the jury's determination will this court find an abuse of trial court discretion. *State v. Hobby,* 706 S.W.2d 232, 234 (Mo.App.1986). "Granting a mistrial for improper argument is a harsh remedy to be exercised only when the overtones of prejudice can be removed by *no other means.*" *State v. Johnson,* 697 S.W.2d 213, 214 (Mo.App. 1985). Only when a prosecutor makes direct and certain reference to the defendant's failure to testify is reversible error committed; and in the case of an indirect reference, the court must review the statement in context to "determine whether it 'highlighted' or was 'reasonably apt to have directed the jury's attention to the fact he did not testify.'" *State v. Robinson,* 696 S.W.2d 826, 833 (Mo.App.1985). In this case, the prosecutor's comments were made in rebuttal to defense counsel's argument that there was no proof of conspiracy. The prosecutor tried to explain the difficulty of proving the existence of a conspiracy by direct evidence as it would often involve the testimony of those connected with the crime; those with a community of interest would often be expected to testify favorably toward a defendant. *State v. Reid,* 712 S.W.2d 74, 75 (Mo.App. 1986). Under these circumstances it is the rule that a prosecutor may comment on the failure of a defendant to call such a witness. *State v. Wilkerson,* 559 S.W.2d 228, 229–330 (Mo.App.1977). This argument did not highlight the fact that defendant failed to testify.

Defendant's contention that these comments in light of his co-defendant appearing "shackled" and "in prison clothing" were prejudicial is also without merit.

Courtroom identification of Robinson was made by the state's witnesses, Mrs. Easdale and Sheriff Gander. The witnesses also identified Bates through a photograph. The pertinent testimony of Mrs. Easdale in identifying Robinson and Bates:

MR. RAYMOND: At this juncture, I would propose to have Mrs. Easdale identify Calvin Robinson.

MR. DUNCAN: I have no objection to him stepping out here for the purpose of identification.

THE COURT: Very well

(BEFORE THE COURT AND JURY)

Q. Mrs. Easdale, the man who just entered the room, I want you to look at him and tell me, is that the person that was at your home and property on April 8, 1983, that you know to be Calvin Robinson?

A. Yes; it is.

(STATE'S EXHIBIT NO. 3 MARKED BY REPORTER FOR PURPOSE OF IDENTIFICATION.)

Q. Mrs. Easdale, I hand you what has been marked as State's Exhibit No. 3, I want you to look at that and tell me if that is the person that was at your home and property on April 8, 1983, that you know to be Fred Bates?

A. Yes; it is.

MR. RAYMOND: I offer in evidence State's Exhibit No. 3, Your Honor.

MR. DUNCAN: I have no objection.

THE COURT: State's Exhibit 3 will be received.

Sheriff Gander similarly identified the co-conspirator:

Q. I hand you what has been marked State's exhibit 3 and ask you to look at it and tell me if that is the person you know to be Fred Bates.

A. Yes; it is.

Q. Did you take that picture?

A. Yes, I did.

Q. Is that a fair and accurate representation of what Fred Bates looked like on April 8, 1983?

A. It is.

Q. I want you to look around the Court-room and tell me if you see the person you know to be Calvin Robinson, in this Courtroom today?

A. Yes, it is.

Q. Where is he?

A. Standing directly behind the jury box with a short-sleeved white shirt on.

From the above testimony we note, not only did defendant fail to object to these identifications, but that the record failed to indicate that the co-conspirators appeared in prison clothing. In order for this court to review an alleged trial error, the appealing party must see to it that the record on appeal incorporates the basis for the challenged error. *State v. Greathouse,* 694 S.W.2d 903, 910 (Mo.App.1985).

For the foregoing reasons the judgement is affirmed.

All concur.