**STATE of Missouri, Respondent,**

v.

**Shelly L. NORTON, Appellant.**

No. 49517.

Missouri Court of Appeals,
Western District.

May 30, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 1995.

Application to Transfer Denied Sept. 19, 1995.

Emmett D. Queener, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Becky Owenson Kilpatrick, Asst. Atty. Gen., Jefferson City, for respondent.

Before FENNER, C.J., P.J., and BRECKENRIDGE and SPINDEN, JJ.

FENNER, Chief Judge.

Appellant, Shelly Norton, appeals his conviction after trial by jury of murder in the second degree pursuant to § 565.021, RSMo1994, and armed criminal action pursuant to § 571.015, RSMo1994. Appellant does not challenge the sufficiency of the evidence, instead alleging that error was committed by the trial court in overruling his *Batson* challenge to the peremptory strikes of two African–American venirepersons during voir dire and in overruling his motion to suppress statements made prior to being given *Miranda* warnings.

Reviewing the record in the light most favorable to the verdict, it is apparent that appellant lived with his aunt on May 8, 1993,

in a house located at 3804 East 60th Street in Kansas City, Missouri. On this evening, Mike Williams, a man with whom appellant's aunt had been romantically involved, came to the home occupied by appellant, his aunt, and his brother. Williams had a history of being loud and rowdy when he drank, and had been asked to move out of appellant's house by appellant's aunt because of his persistent drinking a few weeks earlier. Williams was allowed into the house, however, and went into a room with appellant's aunt to talk. When Williams and appellant's aunt finished talking, Williams went into the living room where appellant was asleep. Appellant awoke and saw Williams staring at him in a strange manner. An argument ensued, ending with appellant shooting Williams six times.

After the shooting, appellant took his aunt to a neighbor's house and proceeded to a liquor store at 5802 Swope Parkway, where he used a pay telephone to place a 911 call. Appellant identified himself, reported that he had shot someone, and held on the line until police officers arrived. When Sergeant David Starbuck arrived at the 5802 Swope Parkway location, appellant confirmed his identity and reported that he had shot someone named Mike at a house located at 3204 East 60th Street. Appellant then informed Starbuck of how he had awakened to find Williams staring at him in a strange way and that he "went off" and shot Williams.

Appellant was then asked by Starbuck to take him to the scene of the shooting and appellant agreed to do so. Though appellant was placed in handcuffs prior to going to the scene, he was not formally arrested and had not been given a *Miranda* warning. Upon arrival at the scene, the officers entered the house and found Williams lying dead inside the door. Appellant was then placed under arrest.

At approximately 8:30 p.m., Detective Edward Glynn advised appellant of his *Miranda* rights. Appellant signed a written waiver form, gave an initial interview, and agreed to give a videotaped statement. In his videotaped statement, appellant admits that Williams had not threatened him in any way,

but claims that he shot Williams because he was afraid of what Williams might do.

After giving his statements, appellant was charged with second degree murder and armed criminal action. Appellant moved to suppress his statements made to Sergeant Starbuck at the site of the 911 call, but this motion was denied. At trial, appellant renewed his objection to testimony regarding information contained in these statements. The jury returned verdicts of guilty on both counts, recommending a sentence of 20 years imprisonment for the murder conviction and a concurrent fifteen year sentence for the armed criminal action conviction. Notice of this appeal was timely filed thereafter.

## I. BATSON CHALLENGES

After the close of voir dire and the striking of potential jurors for cause, the State articulated six peremptory strikes. Four of the six venirepersons the State initially sought to peremptorily strike were African–Americans. Appellant objected to the strikes of the four African–American venirepersons based on the principals found in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny. In *Batson,* the United States Supreme Court held that a defendant in a state criminal trial could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire. *Griffith v. Kentucky,* 479 U.S. 314, 316, 107 S.Ct. 708, 709–10, 93 L.Ed.2d 649 (1987).

The trial court sustained appellant's initial *Batson* objection based on a concern that two of the four African–American venirepersons were allegedly struck because they had family members who were or had been in prison, yet similarly situated white venirepersons were not struck. The trial court also expressed some concern about the strikes of the other two African–American venirepersons, Berry and Watts, who were allegedly struck because they were not paying attention, rolling their eyes, snickering, and laughing during voir dire. The trial court instructed the State to redo all of its peremptory strikes.

The State's second list of peremptory strikes also contained the names of venirepersons Berry and Watts. The appellant renewed his *Batson* objection to the peremptory strikes of these two African–American venirepersons.

In Missouri courts, once the defendant raises a *Batson* challenge with regard to one or more specific venirepersons struck by the State and identifies the cognizable racial group to which the venireperson or persons belong, the State is required to offer an explanation for the strike. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc) *cert. denied*, ——— U.S. ———, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). The explanation must be race-neutral, related to the case to be tried, clear and reasonably specific, and legitimate. *State v. Rios*, 840 S.W.2d 284, 286 (Mo.App.1992). Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866–67, 114 L.Ed.2d 395 (1991); *Parker*, 836 S.W.2d at 934. *Batson* is not satisfied, however, by "neutral explanations" that are no more than facially legitimate, reasonably specific, and clear. *State v. Antwine*, 743 S.W.2d 51, 65 (Mo.1987).

Once a prosecutor articulates a race-neutral reason for the strike that is more than facially legitimate, the defendant must show that the state's explanation for the strike is merely pretext and that the strikes were racially motivated. *Parker*, 836 S.W.2d at 939; *Antwine*, 743 S.W.2d at 64. Foremost among these factors is the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case. *Parker*, 836 S.W.2d at 939. Facts or circumstances that detract or lend credence to the prosecutor's proffered explanations are relevant. *Id.* at 939–40. Additional factors that should be considered in determining whether the state's justifications are merely pretext include the existence of similarly situated white jurors who were not struck by the prosecution, the degree of logical relevance between the proffered explanation and the case to be tried in terms of the kind of crime charged, the nature of the evidence to be adduced and the potential punishment if the defendant is convicted, the prosecutor's demeanor or statements during voir dire, the demeanor of the excluded venirepersons, the court's past experiences with the prosecutor, and other objective factors bearing on the state's motive to discriminate on the basis of race, such as the conditions prevailing in the community and the race of the defendant, the victim, and the material witnesses. *Parker*, 836 S.W.2d at 940. The state's failure to use all of its strikes against venirepersons of a racial minority, or the presence of a racial minority on the defendant's jury, are, at most, relevant factors *only* to the extent that they indicate that race was not the prosecutor's motive for the challenged strikes. *Id.*

Once each side has argued their position, the trial judge is left to assess the entire voir dire in determining whether a prosecutor has exercised preemptory challenges in a discriminatory manner. *Antwine*, 743 S.W.2d at 65. Because of the extensive role of the trial court and particularly because the findings of fact turn largely on an evaluation of credibility, a reviewing court must give great deference to those findings. *Id.* at 66. Findings of fact shall not be set aside unless clearly erroneous. *Id.* A finding is clearly erroneous when, though there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed based on an evaluation of all the evidence. *Id.* (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

After appellant renewed his *Batson* objection, the State renewed its justifications for striking venirepersons Berry and Watts because of their inattentiveness during voir dire. Though the State was unwilling to concede that the strikes were based on "hunches" about how venirepersons Berry and Watts would act when questions were being asked of a witness, legitimate hunches are still a proper basis for peremptory strikes. *State v. Mosely*, 873 S.W.2d 879 (Mo.App.1994). Further, with regard to venireperson Watts, the State pointed out that

she indicated on the jury questionnaire that she had prior criminal jury experience, yet during voir dire questioning she made no mention of this experience but indicated she had prior civil jury experience. This discrepancy is certainly a legitimate basis for concern on the part of the State. On their face, the State's justifications for the strikes of venirepersons Berry and Watts are race-neutral and legitimate.

■■■■ Once the prosecutor stated a legitimate, race-neutral basis for the strikes of venirepersons Berry and Watts, appellant was required to show that the State's justifications for the strikes were merely pretext and that the strikes were racially motivated. As part of his renewed *Batson* objection, appellant contended that case law does not authorize a peremptory strike on the basis of a gut feeling founded on the nonverbal conduct of a venireperson absent a proper record made with the court at the time such conduct occurred. Though a prosecutor would be wise to make such a record, there is no explicit requirement that a record be made of conduct by venirepersons that may lead to the use of a peremptory strike by a party. *See State v. Thurman*, 887 S.W.2d 411 (Mo.App.1994) (No record made during voir dire of venireperson's conduct, yet partial justification for strike based on venireperson's appearance of hostility and staring at prosecutors in a hostile manner deemed not inherently discriminatory); *State v. Mack*, 855 S.W.2d 457 (Mo.App.1993) (No record made during voir dire of venireperson's conduct, yet partial justification that venireperson looked mad and disinterested and inattentive accepted by the trial court). Appellant's argument that a sufficient record must be made by the State to support the strikes of venirepersons Berry and Watts based on nonverbal conduct is not supported by case law.

The only other argument articulated by appellant in support of his *Batson* challenge to the strikes of venirepersons Berry and Watts is as follows:

[T]he state claims they were not paying attention, snickering, rolling their eyes, laughing. I do not recall making any such observations. I must admit I was not looking at these venirepersons the entire time, but I would ask the Court to rely upon its own observations in this regard, that it would be awfully easy for the state to claim some sort of nonverbal conduct that only the state was able to observe as a basis for a race-neutral strike and I think that once we start going down that path, its a very slippery slope, the Court should not sanction that sort of race-neutral reason.

Appellant went on to discuss the discrepancy in venireperson Watts' answers about prior jury service on her questionnaire and during voir dire, pointing to the possibility of confusion, and stating that justifying the strike based on the discrepancy was not a "fair reason."

■■■ Appellant does not satisfy his burden of showing the State's justifications were merely pretext through the arguments he has set forth. Appellant essentially argues that because the justification that the venirepersons in question were inattentive is subjective, the court should not sanction such a justification. Merely arguing that the hunch played by the State is a subjective justification is not enough to show it is pretext to conceal an underlying racial motivation. *Thurman*, 887 S.W.2d at 413. Additionally, the trial court did note that the venirepersons in question were observed visiting on one occasion during voir dire. Appellant does not identify any similarly situated white jurors who were not struck and admits he cannot state facts contradicting the observations made by the State. The appellant, victim, and many of the witnesses were all African–Americans, and the conditions in the community do not indicate that the State would have had an objective motive to discriminate. Though neither party provided this court with the final makeup of the jury, it is apparent that at least two African–Americans served on the jury.

■■■ Considering the plausibility of the State's justifications in light of the totality of the facts and circumstances surrounding the case and the failure of appellant to demonstrate that the State's justifications were merely pretext, this court is not left with a definite and firm impression that a mistake

was made. The trial court's finding that the strikes of venirepersons Berry and Watts were not racially motivated was not clearly erroneous. Point denied.

## II. THE MIRANDA QUESTION

Appellant's second contention is that the trial court erred in overruling his motion to suppress statements made to Sergeant Starbuck during their conversation at the liquor store where appellant made the 911 call and prior to appellant taking the police to the scene of the shooting and his resulting arrest. Appellant contends that these statements were made when he had been restrained of his liberty and was in custody amounting to an arrest, therefore, a *Miranda* warning was required before he was questioned in order for the statements to be voluntary and admissible.

 Ordinarily, a ruling on a pretrial motion to suppress may not be asserted as a ground of error on appeal because the pretrial motion to suppress and the admission at trial of the challenged evidence are two distinct procedures. *State v. Williams,* 861 S.W.2d 670, 673 (Mo.App.1993). A defendant is not damaged by the evidence sought to be suppressed until it is introduced in the trial of the case. *Id.* Here, appellant did object at trial to the admission of the statements he sought to suppress by pretrial motion. Therefore, this court will review the propriety of the pretrial ruling. "When reviewing a trial court's ruling on a motion to suppress, the inquiry is limited to whether the court's decision is supported by substantial evidence, and deference is given to the trial court's superior opportunity to determine credibility of witnesses." *State v. Feltrop,* 803 S.W.2d 1, 12 (Mo. banc 1991), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). The trial court's ruling should not be disturbed unless manifest error is apparent. *State v. Luster,* 750 S.W.2d 474, 478 (Mo. App.1988).

Appellant bases his argument that his liberty was restrained and he was taken into custody, amounting to an arrest on cross examination testimony from Sergeant Starbuck. Appellant argues that Sergeant Starbuck indicated that had appellant decided he wanted to leave once he identified himself as a 911 caller, that Starbuck *may* have made the determination to detain him, and that appellant *probably* was not free to go until he provided more information regarding the shooting. Additionally, appellant contends that because he was placed in handcuffs prior to being voluntarily transported to the scene of the crime, he was in custody amounting to arrest.

 Coercive police activity is the necessary predicate to finding any statement involuntary, and, therefore, inadmissible. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986). The *Miranda* warning and the rights it explains are designed to protect an individual in the inherently coercive custodial interrogation setting. A person must be advised of his Fifth Amendment rights prior to a custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). A custodial interrogation occurs only when the suspect is formally arrested or is subjected to arrest-like restraints. *State v. Middleton,* 854 S.W.2d 504, 516 (Mo.App. 1993). A person who is being asked preliminary, investigatory questions by the police is not in custody for the purpose of requiring a *Miranda* warning. *State v. Crane,* 841 S.W.2d 271, 273 (Mo.App.1992). This principal was first enunciated by the United States Supreme Court in *Miranda:*

> Our decision is not intended to hamper the traditional function of police officers in investigating crime.... General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.

384 U.S. at 477–78, 86 S.Ct. at 1629. Even if the police become suspicious of the individual they are questioning or the individual becomes the focus of their investigation, a *Miranda* warning is not required prior to questioning unless there is a custodial interrogation. *Middleton,* 854 S.W.2d at 515–16.

 The questions asked appellant by Sergeant Starbuck when he arrived at the liquor store where appellant made the 911 call were investigatory in nature. Officer Starbuck had just arrived at the scene, and

testified that his only intention upon initially approaching appellant was to conduct a general investigation of the shooting report. Starbuck's intent was to find out what happened and why appellant had placed the 911 call. What *might* have happened *if* appellant requested to leave after Starbuck arrived is irrelevant to the analysis of whether a *Miranda* warning was required. Our analysis must focus on the events that actually occurred.

The record shows appellant cooperated fully with police throughout their investigation. He voluntarily placed the 911 call. He voluntarily spoke with Sergeant Starbuck when questioned at the site of the 911 call. He voluntarily agreed to take the police to the scene of the shooting. At the time of the questioning, the police had not even verified that a crime had been committed. There is simply no evidence of coercive police activity that *Miranda* warnings are designed to protect against. The questioning of appellant at the site of the 911 call was clearly investigatory and not part of a custodial interrogation.

The fact that appellant was placed in handcuffs prior to being transported to the scene of the shooting is also irrelevant to our *Miranda* analysis. Appellant was not questioned after he was placed in handcuffs. None of the information sought to be suppressed was elicited after he was placed in handcuffs and transported by patrol car to the scene of the shooting. We need not address whether handcuffing appellant transformed the situation into a custodial setting.

Clearly, there was substantial evidence to support the trial court's finding that appellant was not "in custody" or deprived of his liberty so as to warrant a *Miranda* warning when Sergeant Starbuck questioned him at the site of the 911 call. As no manifest error is apparent, the ruling of the trial court on the pretrial motion to suppress will not be disturbed. Point denied.

The judgment of the trial court is affirmed in all respects.

All concur.