**STATE of Missouri, Respondent,**

**v.**

**James HICKLIN, II, Appellant.**

**No. WD 54270.**

Missouri Court of Appeals,
Western District.

June 9, 1998.

Barbara L. Greenberg, Carson & Greenberg, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, C.J., P.J., and SMART and LAURA DENVIR STITH, JJ.

ULRICH, Chief Judge, Presiding Judge.

James Hicklin appeals his convictions following a jury trial for first degree murder, section 565.020.1, RSMo 1994, and armed criminal action, section 571.015.1, RSMo 1994, and concurrent sentences of life imprisonment without the possibility of probation or parole and 100 years imprisonment, respectively. He claims that the trial court erred in (1) denying his pretrial motion for discovery of the juvenile record of the State's witness, Chico Pearman, (2) admitting a recorded statement of a State witness to refresh her recollection, and (3) admitting statements made by him to law enforcement officers. The judgment of convictions is affirmed.

**Facts**

On Friday, September 22, 1995, James Hicklin and his friend, Christopher (Chico) Pearman, arranged a drug transaction with the victim, Sean Smith, wherein Mr. Hicklin would purchase $5000 worth of crystal methamphetamine from Mr. Smith on Sunday, September 24. The next evening, Mr. Hicklin told Shawna Montgomery, a friend, that he was afraid something would happen to him if he did not present the money to pay for the drugs. He stated that he would have to eliminate Mr. Smith. On Sunday, Mr. Hicklin and Mr. Pearman, residents of Clinton, Missouri, met Mr. Smith at his trailer home in East Lynne, Missouri, to effect the purchase. Mr. Hicklin and Mr. Smith each "did a line of crystal meth." The three men then went to a rural house where Mr. Hicklin said that he had hidden the money to purchase the drugs.

After searching for the money for over an hour, Mr. Smith announced that he did not believe Mr. Hicklin had the money and that he was going to walk home. Mr. Smith walked away. Both Mr. Hicklin and Mr. Pearman got into Mr. Hicklin's truck-Mr. Hicklin sat in the driver's seat and Mr. Pearman was in the passenger seat. Mr. Hicklin pulled a .38 caliber revolver out of his coat pocket and set it on the seat of the truck between Mr. Pearman and himself. The two men then saw Mr. Smith walking back toward the house and the truck in which they sat. As he reached the passenger side window, Mr. Hicklin leaned over Mr. Pearman and shot Mr. Smith in the face with the revolver. Mr. Smith fell to the ground clutching his face and screaming. Mr. Hicklin then leaned out the passenger's side window and shot Mr. Smith two more times in the back.

After the shooting, Mr. Hicklin directed Mr. Pearman to get out of the truck and to help him move the body. As the men were straightening the body, they saw a small pistol in the back of Mr. Smith's pants. Mr. Hicklin picked up the pistol and threw it into the back of his truck. He and Mr. Pearman then drove back to Mr. Smith's trailer home. On the way, Mr. Hicklin threw Mr. Smith's pistol off a bridge. He also emptied the used shells from his pistol and reloaded it. At Mr. Smith's trailer, Mr. Hicklin looked for valuables. He also left a note to support an alibi defense. The note was addressed to Mr. Smith and his roommates and said that if anyone saw Mr. Smith, or if Mr. Smith returned home, he was to contact Mr. Hicklin about his money. Before leaving the trailer, Mr. Hicklin grabbed a pair of Mr. Smith's shorts and a black T-shirt.

Mr. Hicklin and Mr. Pearman returned to the location of Mr. Smith's body. Using the clothing taken from Mr. Smith's trailer, the two men dragged the body to the edge of a nearby bean field. Mr. Hicklin searched Mr. Smith's pockets and took his wallet and a plastic bag that contained "some scales." He then threw the shorts and T-shirt into the back of his truck. The two men returned once again to Mr. Smith's trailer where Mr. Hicklin rewrote the "alibi" note.

As Mr. Hicklin and Mr. Pearman drove back to Clinton, they encountered a police road block where an automobile accident had

occurred. As they approached the road block, Mr. Hicklin threw the items recovered from Mr. Smith's body out of the truck window. When they returned to Clinton, the men went to visit Ms. Montgomery. Mr. Hicklin told Ms. Montgomery that "it was done" and that Sean Smith was dead.

Several anonymous phone calls lead to the discovery of Mr. Smith's body on September 27, 1995. An autopsy revealed that the victim had suffered gunshot wounds to the right side of his back near the spine, to his right cheek, and above his left ear. A .38 caliber bullet was recovered under the victim's scalp.

On the morning of Friday, September 29, 1995, Mr. Hicklin was questioned by several members of the Metro Squad at his home in the presence of his mother and the county juvenile officer. Various reports had been made to law enforcement officials that Mr. Hicklin and Mr. Pearman were some of the last people to have seen Mr. Smith alive. Mr. Hicklin, therefore, was asked whether he had any information that might assist the officers in the investigation. Mr. Hicklin told the investigators that he and Mr. Pearman had driven to Mr. Smith's trailer on Sunday, September 24, but that Mr. Smith left almost immediately in another car and never returned. Mr. Hicklin, however, could not identify the vehicle or the person with whom Mr. Smith left.

A couple of hours later, two more detectives arrived at Mr. Hicklin's home having learned additional information about Mr. Hicklin. The detectives had learned that a note from Mr. Hicklin was found in Mr. Smith's trailer. The note referenced $5000 and was threatening. The juvenile officer advised Mr. Hicklin of his *Miranda* and juvenile rights. Mr. Hicklin waived his rights and told the officers that he wrote the note as a "tough love" or "scare tactic" to get Mr. Smith to stop using drugs. Following the questioning, Mr. Hicklin consented to a search of his truck. A pair of shorts and a black T-shirt covered with burrs were recovered. The officers left without arresting Mr. Hicklin.

After the officers had gone, Mr. Hicklin went to a friend's house where he met Krystle Winkle. Ms. Winkle accompanied Mr.

Hicklin back to his house. During the drive, Mr. Hicklin admitted killing Sean Smith. He explained that "a drug deal had gone wrong" and that Mr. Smith had threatened to kill him if he did not come up with the money. Mr. Hicklin also asked Ms. Winkle if she would be his alibi.

Later that afternoon, police officer's interviewed Mr. Pearman about the shooting. Mr. Pearman implicated Mr. Hicklin, and police officers returned to Mr. Hicklin's home and arrested him. A search was conducted of his home, and several live rounds of .38 caliber ammunition were recovered.

Mr. Hicklin was charged by information with one count of first degree murder and one count of armed criminal action on December 4, 1995. He filed several pretrial motions on January 22, 1997, including a "Motion for Discovery of the Arrest and Conviction Reports of Witnesses" and a "Motion to Suppress Any and All Statements taken from Defendant by Law Enforcement Officers." In addressing the discovery motion, the trial court ruled that the State must provide the defense with all conviction records of all witnesses it intended to call. The court overruled the motion regarding Mr. Hicklin's motion for arrest records of the State's witnesses. Because some of the State's witnesses were juveniles, the prosecutor then asked about juvenile records. The court stated that juveniles do not get convictions, so juvenile records were outside the scope of disclosure. The trial court also overruled the suppression motion.

Mr. Hicklin was convicted following a jury trial of first degree murder, section 565.020.1, RSMo 1994, and armed criminal action, section 571.015.1, RSMo 1994. He was sentenced to concurrent terms of life imprisonment without the possibility of probation or parole and 100 years imprisonment, respectively. This appeal followed.

## I. Use of Juvenile Record to Impeach

In his first point on appeal, Mr. Hicklin claims that the trial court erred in denying his pretrial request for discovery of the juvenile record of the State's witness, Chico Pearman. He argues that the court's ruling

denied him his fundamental Sixth Amendment right of cross-examination of the witnesses who testified against him. Specifically, he contends that he should have been able to use the juvenile record during his cross-examination of Mr. Pearman to show the existence of possible bias and prejudice.

■ Although Mr. Hicklin filed a pretrial "Motion for Discovery of the Arrest and Conviction Reports of Witnesses," he did not request the juvenile records of any State witness including Mr. Pearman. Mr. Hicklin's motion requested the disclosure of "the arrest and conviction reports" of all witnesses. A ruling against a defendant in juvenile court is not considered a criminal "conviction." § 211.271.1, RSMo 1994; *State v. Collier,* 892 S.W.2d 686, 691 n. 2 (Mo.App. 1994).

■ At the hearing on the motion, the court granted Mr. Hicklin's request for the conviction reports of witnesses, but denied the request for the arrest records. Upon the court's ruling, the prosecutor asked if the ruling included juvenile records since some of the State's witnesses were juveniles. The court answered that the ruling did not include juvenile records. At no time did the defense request the disclosure of juvenile records or object to the court's ruling regarding those records. Instead, Mr. Hicklin argues for the first time on appeal that the trial court erred in failing to order the State to furnish juvenile records. A party may not complain of error in the failure of the trial court to take an action not requested. *State v. Burgess,* 800 S.W.2d 743, 746 (Mo. banc 1990). When an issue is raised for the first time on appeal, it is reviewed only for plain error. *State v. Whitfield,* 939 S.W.2d 361, 366 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 97, 139 L.Ed.2d 52 (1997). Relief is granted under the plain error rule only when manifest injustice or a miscarriage of justice would result. *Burgess,* 800 S.W.2d at 746.

■ The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct.

1105, 39 L.Ed.2d 347 (1974). This right is applicable to all criminal proceedings in state courts under the Fourteenth Amendment. *State v. Russell,* 625 S.W.2d 138, 140 (Mo. banc 1981)(citing *Pointer v. Texas,* 380 U.S. 400, 403, 406–407, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)). A fundamental interest secured by the confrontation clause is the right of cross-examination. *Davis,* 415 U.S. at 315, 94 S.Ct. 1105; *Russell,* 625 S.W.2d at 138. Cross-examination is the principal means to test the believability of a witness and the truth of his testimony. *Davis,* 415 U.S. at 316, 94 S.Ct. 1105. A witness may be impeached through cross-examination in two ways. *Id.* One way permits a cross-examiner to discredit the general credibility of the witness. *Id.* "A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.*

■ The right of cross-examination is not unlimited. *State v. Baker,* 859 S.W.2d 805, 809 (Mo.App.1993). Cross-examination is subject to the broad discretion of the trial court to preclude repetitive and unduly harassing interrogations. *Id.* "Generally, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish." *Id.*

■ Section 211.271.3, RSMo 1994, provides that the reports and records of the juvenile court are not lawful or proper evidence against the juvenile "and shall not be used for any purpose whatsoever in any proceeding, civil or criminal." The juvenile protection statute generally ensures against cross-examination on the subject of the juvenile record and impeachment by means of the juvenile record. *Collier,* 892 S.W.2d at 691. The statute is "mandatory" and "all-inclusive," and yields only to the extent required by the Sixth Amendment. *State v. Richardson,* 923 S.W.2d 301, 311 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996). In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39

L.Ed.2d 347 (1974), the United States Supreme Court recognized this constitutional exception to the general statutory rule regarding the use of juvenile records. *Richardson*, 923 S.W.2d at 311. *Davis* held that the Sixth Amendment right to confront a witness requires the admission of juvenile records against the witness only as they pertain to the existence of a possible bias or prejudice of the witness. *Id.* (citing *Davis*, 415 U.S. at 316–317, 94 S.Ct. 1105). Impeachment for bias is permitted where the witness has a motive to lie because he is subject to the control of the juvenile authorities. *Id.*(citing *Davis*, 415 U.S. at 317–318, 94 S.Ct. 1105).

In *Davis*, the defendant was accused of burglarizing a bar and removing the bar's safe. The juvenile witness saw the defendant standing next to a parked car near where the safe was later discovered. The juvenile was on probation from the juvenile court after being adjudicated delinquent in the burglaries of two cabins. The prosecution moved to prevent any reference to the juvenile's records by the defense on cross-examination. In opposing the prosecution's motion, the defense declared that it would not introduce the juvenile records as a general impeachment of the witness's credibility but that the witness's testimony was induced by his concern that the police would suspect him as the burglar thereby endangering his probation and was, therefore, relevant to show the witness's bias.

The Supreme Court held that the defendant's right to cross-examine the witness for bias and impartiality outweighed the interest in protecting the anonymity of juvenile offenders. *Davis*, 415 U.S. at 320, 94 S.Ct. 1105. The defendant, therefore, should have been allowed to explore the bias of the witness because of his vulnerable status as a probationer. *Id.* at 318, 94 S.Ct. 1105.

■ In this case, Mr. Hicklin argues, based on *Davis*, that he should have been able to use Mr. Pearman's juvenile record during cross-examination to explore Mr. Pearman's possible bias and prejudice. This case, however, is distinguishable from *Davis*. In *Davis*, the defendant was unable to make a record from which to argue *why* the juvenile witness might have been biased. *Id.* at 318, 94 S.Ct. 1105. The limited cross-examination allowed at trial in *Davis* revealed only that the juvenile was not upset or uncomfortable about the discovery of the safe near his home and that he was not worried about any suspicions that the police had about his involvement in the burglary. *Id.* at 312. Because the defense was prevented from revealing that the juvenile had been on probation for the juvenile delinquency adjudication for burglary, "[the juvenile's] protestations of unconcern over possible police suspicion that he might have had a part in the [bar] burglary and his categorical denial of ever having been the subject of any similar law-enforcement interrogation went unchallenged." *Id.* at 313–314, 94 S.Ct. 1105. Without evidence that the juvenile was on probation under a juvenile court adjudication, the jury might have thought that the defense was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness. *Id.* at 318, 94 S.Ct. 1105.

In this case, Mr. Hicklin had ample evidence from which to argue that Mr. Pearman was biased or had an ulterior motive for testifying for the State. Mr. Pearman, himself, testified in detail regarding his involvement in the crime. He explained that he was present when the victim was shot and that he assisted in concealing the body. Furthermore, the juvenile officer in this case testified that Mr. Pearman came under the supervision of the juvenile court as a result of this shooting. On cross-examination, the defense elicited from Mr. Pearman that he was not charged with any crimes arising from his involvement in this incident. The jury was not unaware of Mr. Pearman's possible bias. *Russell*, 625 S.W.2d at 142. The defense had every opportunity to argue that Mr. Pearman might have been motivated to testify against Mr. Hicklin because of his own involvement in the crime and the benefit he received from the state for his testimony. *Baker*, 859 S.W.2d at 810. Additionally, because Mr. Hicklin failed to object to the trial court's ruling regarding the juvenile records, whether Mr. Pearman was under control of the juvenile court for any other reason than the

murder of Mr. Smith was never established. No basis was established, therefore, for inferring that Mr. Pearman testified because of his fear of placing his "vulnerable" status as a juvenile offender in jeopardy. *State v. Shaw,* 839 S.W.2d 30, 34 (Mo.App.1992); *State v. Tolliver,* 562 S.W.2d 714, 720 (Mo. App.1978). Manifest injustice did not result from the trial court's ruling that Mr. Pearman's juvenile record was not discoverable. Point one is denied.

## II. Admission of Witness's Prior Inconsistent Statement

In his second point on appeal, Mr. Hicklin claims that the trial court erred in admitting a recorded statement of Shawna Montgomery to refresh her recollection. During the State's examination of Ms. Montgomery at trial, a portion of a recorded statement that she gave to the police was played. In the statement, Ms. Montgomery told police officers that Mr. Hicklin told her on Sunday night, September 24, that Mr. Smith was dead. Mr. Hicklin argues that the prosecution failed to lay a proper foundation for the introduction of the statement.

At trial, the prosecutor incorrectly stated that the purpose of introducing the recorded statement was to refresh Ms. Montgomery's recollection. To refresh a witness's recollection, the witness must exhibit both a lack of present memory and the need for the aid of the writing to assist recall. *State v. McKinney,* 763 S.W.2d 702, 708 (Mo.App. 1989). If a proper foundation is laid for refreshing recollection, the witness may then be shown the writing to read silently and then testify as to the witness's independent recollection. *Lewis v. Wahl,* 842 S.W.2d 82, 85 (Mo. banc 1992). The writing used to refresh the witness's memory is not introduced into evidence or shown to the jury; the witness's recollection and not the writing is evidence. *State v. Fogle,* 740 S.W.2d 217, 223 (Mo.App.1987).

In this case, the prosecution actually laid a foundation for impeachment of Ms. Montgomery with her prior inconsistent statement. During questioning by the State, Ms. Montgomery was asked what Mr. Hicklin told her on the night of the murder. She answered, "He just said it was done." When asked what "it was done" meant, Ms. Montgomery answered, "it could have meant that either Sean was dead, or it could have meant that the deal went through." Ms. Montgomery denied that Mr. Hicklin told her Sean was dead. At this point, the prosecutor played the portion of her recorded statement made to police to impeach Ms. Montgomery's testimony and to introduce evidence that Mr. Hicklin told Ms. Montgomery that Sean was dead.

Section 491.074, RSMo 1994, provides that a prior inconsistent statement of a witness in a prosecution under chapters 565, 566, and 568, RSMo, shall be received as substantive evidence and the party offering the statement may argue the truth of the statement. A party may impeach his own witness with a prior inconsistent statement without a showing of surprise or hostility. *State v. Phillips,* 940 S.W.2d 512, 520 (Mo. banc 1997). The foundational requirements of section 491.074, RSMo 1994, are that the witness made the statement and that the statement is true. *State v. Lyons,* 951 S.W.2d 584, 594 (Mo. banc 1997)(citing *State v. Bowman,* 741 S.W.2d 10, 13–14 (Mo. banc 1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 60 (1988)). "Whether an inconsistency exists between trial testimony and statements made prior to trial is to be determined by the whole impression and effect of what has been said and done." *State v. Blankenship,* 830 S.W.2d 1, 9 (Mo. banc 1992). At trial, Ms. Montgomery denied she had told police that Mr. Hicklin said, "Sean was dead." She also acknowledged that the statement played was a true and accurate statement she made to police. A proper foundation was, therefore, laid to introduce Ms. Montgomery's statement to police. Point two is denied.

## III. Admission of Mr. Hicklin's Statements to Police

In his final point on appeal, Mr. Hicklin claims that the trial court erred in admitting the statements he made to police prior to receiving *Miranda* warnings. He contends that the questioning by police at his home on Friday morning, September 29, was a custo-

dial interrogation necessitating *Miranda* warnings. Specifically, he argues that the questioning was "inherently coercive" in that he was crowded into a small room with four adult strangers in positions of authority and it was unapparent to him that he had the option of not answering the questions.

 A person must be advised of his Fifth Amendment rights prior to custodial interrogation. *State v. Norton,* 904 S.W.2d 265, 271 (Mo.App.1995)(citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Additionally, section 211.059.1, RSMo 1994, requires that a juvenile taken into custody be given the warnings outlined in the statute prior to questioning.

A custodial interrogation is defined as questioning by law enforcement officers after a person is taken into custody or deprived of freedom in any significant way. *State v. Copeland,* 928 S.W.2d 828, 853 (Mo. banc 1996), *cert. denied,* — U.S. —, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997). A custodial interrogation occurs only when the suspect is formally arrested or is subjected to arrest-like restraints. *State v. Dye,* 946 S.W.2d 783, 786 (Mo.App.1997). A person who is asked preliminary, investigatory questions by police officers is not in custody. *Id.* "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by [the *Miranda*] holding." *Norton,* 904 S.W.2d at 271 (quoting *Miranda,* 384 U.S. at 477–478, 86 S.Ct. 1602). Even if the police become suspicious of the person being questioned or the individual becomes the focus of their investigation, a *Miranda* warning is not required prior to questioning unless there is a custodial interrogation. *Norton,* 904 S.W.2d at 271.

The questions asked Mr. Hicklin by the detectives at his home on the morning of September 29 were investigatory in nature. After receiving various reports that Mr. Hicklin and Mr. Pearman were some of the last people to have seen Mr. Smith alive, law enforcement officers decided to ask Mr. Hicklin if he had any information that might assist in the investigation. He was not considered a suspect until other officers arrived

during the questioning with additional information about Mr. Hicklin. He was then given the appropriate warnings before being questioned further. After the questioning ended, the police officers left without arresting Mr. Hicklin. During the questioning at his home, Mr. Hicklin was not taken into custody, subjected to arrest-like restraints, or deprived of his freedom. *Miranda* warnings were, therefore, not required. The trial court did not err in admitting Mr. Hicklin's statements to police. Point three is denied.

The judgment of convictions is affirmed.

All concur.